**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Plaintiff Below, Appellant,**

v.

**Brenda NALBONE, Defendant Below, Appellee.**

Supreme Court of Delaware.

Submitted: July 6, 1989.
Decided: Dec. 28, 1989.

F. Alton Tybout, (argued) and Donald M. Ransom, Esquire, Tybout, Redfearn & Pell, Wilmington, for appellant.

Kevin M. Howard, (argued), Prickett, Jones, Elliott, Kristol & Schnee, Dover, for appellee.

Before CHRISTIE, C.J., HORSEY, MOORE, WALSH and HOLLAND, JJ., constituting the Court *en banc*.

WALSH, Justice, for the majority.

This appeal arises out of a declaratory judgment action filed in the Superior Court by State Farm Mutual Automobile Insurance Company ("State Farm") to determine its obligation to pay no-fault benefits to its

insured, Brenda Nalbone ("Nalbone"), pursuant to 21 *Del.C.* § 2118. We have accepted certification of the following question: is an injured person entitled to be compensated for net wages lost while she is unable to be actively employed, even though she has received or is receiving reimbursement for such losses pursuant to a wage continuation or disability plan. We conclude that such recovery is not authorized where it appears that the receipt of such employment benefits creates no detriment or loss of entitlement to reimbursement of future losses.

## I

The parties have stipulated to the following facts. Nalbone was injured in an automobile accident on November 15, 1986, at which time she was insured under a State Farm policy that extended personal injury protection ("PIP") benefits pursuant to 21 *Del.C.* § 2118. State Farm concedes that, as a result of the accident, Nalbone is entitled to PIP benefits under its policy. Nalbone has asserted a claim for loss of net income pursuant to 21 *Del.C.* § 2118(a)(2)a.2.[1] Nalbone's employer has a wage continuation plan that provides for the payment of part or all of her lost wages. State Farm has paid Nalbone the difference between her normal net weekly earnings and the amount paid by her employer under its wage continuation plan. Nalbone is not required to contribute to her employer's wage continuation plan and her benefits are not accrued; that is, if unused, they cannot be converted into vacation time or cash. Benefits provided to Nalbone are in the form of sick pay. Her employer does not have a right of subrogation.

---

**1.** § 2118. Requirement of insurance for all motor vehicles required to be registered in this State; penalty.
　(a) No owner of a motor vehicle registered in this State, other than a self-insurer pursuant to § 2904 of this title, shall operate or authorize any other person to operate such vehicle unless the owner has insurance on such motor vehicle providing the following minimum insurance coverage:
　　＊　　＊　　＊　　＊　　＊　　＊
　(2)a. Compensation to injured persons for reasonable and necessary expenses incurred

Nalbone seeks to recover from State Farm, as PIP benefits, the entire amount of her net lost wages without reduction for the wage loss compensation received from her employer. State Farm denies any obligation under 21 *Del.C.* § 2118 to pay as net lost earnings those amounts that Nalbone has received pursuant to her employer's wage continuation plan.

## II

The question before us is essentially one of statutory interpretation since State Farm, like all insurers operating in this State, is required to issue policies that extend PIP benefits coextensively with the requirements of 21 *Del.C.* § 2118. A policy provision or coverage interpretation that does not meet the minimum requirements of the statute will not receive judicial recognition. *Bass v. Horizon Assurance Co.*, Del.Supr., 562 A.2d 1194 (1989); *Frank v. Horizon Assurance Co.*, Del.Supr., 553 A.2d 1199 (1989). Unfortunately, recourse to the statute itself provides little insight into the legislative purpose concerning the certified question. While the language of section 2118(a)(2)a.2. mandates compensation for the net amount of lost earnings, no guidance is offered as to when earnings may be deemed "lost".[2] We thus approach the question from the standpoint of the primary policy considerations underlying the Delaware No–Fault Statute, *i.e.*, is the goal of section 2118, the protection and compensation of persons injured in automobile accidents, advanced by requiring payment for losses already compensated through other sources?

The parties have argued their respective positions in terms of application of the collateral source rule. Nalbone contends that

---

within 2 years from the date of the accident for:
　　＊　　＊　　＊　　＊　　＊　　＊
　2. Net amount of lost earnings. Lost earnings shall include net lost earnings of a self-employed person.

**2.** There is no dispute that the terms "net earnings" refers to so-called "take home" earnings, *i.e.*, the amount received by an employee after authorized deductions from gross earnings.

the collateral source rule should be extended to permit recovery for her lost earnings irrespective of whether those losses have been compensated by a third party, her employer. To the contrary, State Farm argues that the collateral source rule finds application only in claims asserted against tortfeasors and their insurance carriers and is irrelevant to insurance claims in which fault is not a consideration.

The collateral source rule was first recognized in Delaware in *Yarrington v. Thornburg*, Del.Supr., 205 A.2d 1 (1964). The rule finds classic application in an action brought by an injured party against a tortfeasor. Although in *Yarrington* this Court ruled that the medical payments received by the plaintiff could be set off against claimed damages because the source of the disputed payments was the tortfeasor's insurance carrier, the collateral source rule was approved in the following language:

> The collateral source doctrine is predicated upon the theory that a tortfeasor has no interest in, and therefore no right to benefit from, monies received by the injured person from sources unconnected with the defendant. The doctrine, however, does permit the tortfeasor to obtain the advantage of payments made by himself or from a fund created by him; in such an instance the payments come, not from a collateral source, but from the defendant himself.

205 A.2d at 2.

The rationale for the collateral source rule appears to emphasize the deterrent and quasi-punitive functions of tort law. It is considered better that the innocent plaintiff receive a windfall than that the wrongdoing defendant bear less than the full cost of his negligent conduct. Some commentators have argued that even this "pure" application of the collateral source rule is inappropriate in an age when the rationale of the tort law is, or should be, focused more on risk-spreading and providing adequate compensation at the lowest cost. *See, e.g.*, Fleming, *The Collateral Source Rule and Loss Allocation in Tort Law*, 54 Cal.L.Rev. 1478 (1966); Harper, James &

Gray, *The Law of Torts* §§ 25.19–.23 (2d ed. 1986 & Supp.1989); P. Huber, *Liability: The Legal Revolution and Its Consequences* 193 (1988). Several states have enacted legislation that limits the extent of double recovery or windfall results. For example, New Jersey law does not permit an insured to recover PIP benefits that duplicate certain other disability payments. *See Smith v. Allstate Ins. Co.*, N.J.Super.Ct. Law Div., 203 N.J.Super. 610, 497 A.2d 602, 605 (1985); *Puzio v. New Jersey Mfrs. Ins. Co.*, Passaic County Ct., 165 N.J.Super. 585, 398 A.2d 934 (1977). Similarly, New York, by statute, has precluded double recovery of lost earnings through receipt of social security disability benefits and PIP benefits. *See Ardolino v. City of New York*, App.Div., 94 A.D.2d 780, 463 N.Y.S.2d 26 (1983). Although State Farm relies upon these decisions as supportive of the policy argument against double recovery, their force is limited because they represent the implementation of clear legislative restrictions against duplication of PIP benefits.

Delaware has not enacted a direct statutory modification of the collateral source rule. The no-fault statute, 21 *Del.C.* § 2118(g), limits the collateral source rule by precluding an insured from suing a tortfeasor for damages for which compensation is available under the statute. Somewhat cryptically, the statute limits recovery against the tortfeasor "whether or not . . . [the no-fault] benefits are actually recoverable." State Farm contends that this language precludes Nalbone's claim for PIP benefits. Under State Farm's argument, Nalbone is entitled to receive lost wage benefits from her employer; therefore, the benefits of her no-fault policy are "available" but not "actually recoverable." The absence of a legislative history or prior judicial construction renders this argument inconclusive but the reasoning seems at least plausible. One of the policies underlying the no-fault statute is the provision of quick and adequate compensation, but this policy is not compromised by State Farm's interpretation of the statutory language. It is difficult to imagine a situation in which the insured would be precluded from

recovering damages from a collateral source, his no-fault insurer, *and* the tortfeasor. Therefore, the language suggests that to the extent that payments are received from a collateral source, the insured may not recover from the insurer or the tortfeasor.

State Farm also argues that permitting double recovery of PIP benefits will inevitably result in increased insurance costs as insurance carriers seek to recoup such payments through higher rates. While this argument has theoretical appeal, the empirical proof is lacking in this case. State Farm has pointed to no study or data that demonstrates an adverse premium effect in jurisdictions that have extended the collateral source rule indiscriminately to permit duplicate payment of PIP benefits. On the one hand, it is possible that if no-fault insurers are not required to provide compensation for wages not actually lost, the gross amount of losses that insurance companies may expect to bear will decrease and the premiums required to support such losses will be lower. It could thus be argued that limiting the collateral source rule will further the no-fault policy of minimizing rates. To accept this conclusion one would have to indulge the belief, perhaps naively, that insurance carriers will always pass on reduced underwriting costs to policy holders. In the absence of supporting empirical data, we can make no such judgment on this record and thus do not find this argument persuasive.

Three decisions applying Delaware law have spoken to the interaction between no-fault insurance and the collateral source rule. In *Dickerson v. Continental Casualty Co.*, Del.Super., C.A. No. 82C–MR–8, Poppiti, J. (Sept. 1, 1983), the court held that no-fault benefits should not be reduced by the value of payments received through an independently purchased health insurance policy. In *Freeman v. Allstate Insurance Co.*, Del.Super., C.A. No. 42–1973, Balick, J. (Nov. 19, 1973), on the other hand, it was ruled that a no-fault insurer is not required to duplicate lost wages paid through normal sick leave benefits. The rationale for this holding was that preventing such double recoveries will help to keep

insurance premiums lower. Finally, in *Willis v. Continental Casualty Co.*, D.Del., 649 F.Supp. 707 (1986), the District Court squarely confronted the issue raised by the certification in this case and attempted to predict what this Court would decide. The *Willis* court held that the collateral source rule allows an insured to recover "lost" wages from his no-fault insurer, even though his employer had already made him whole. The court reasoned that the no-fault insurer's subrogation rights would allow it to shift the cost of the excess benefit to the tortfeasor (or the tortfeasor's insurance company). Thus, the ultimate result would be the same as if the injured party sued the tortfeasor directly and the collateral source rule were applied.

*Willis* ultimately relied upon one of the several competing policies that we confront here. *Willis* saw the goal of no-fault insurance, and of tort law in general, as the quick and full compensation of injured parties. In pursuit of this policy, the court in *Willis* allowed an injured party to seek recovery from as many sources as possible and then relied upon subrogation to allocate the loss fairly among the involved parties. Moreover, since, in the usual case, subrogation will eventually place the loss upon the tortfeasor, the *Willis* court also sought to serve the policy of deterring negligent conduct by making tortfeasors bear the full cost of their acts.

Extensions of the collateral source rule, as sanctioned by *Willis*, may produce unusual results. The *Willis* court justified the prospect of the insured's double recovery by rationalizing that "[i]n the normal course [no-fault] insurers will pay the insured, and then pursue the subrogated claims against tortfeasors and their insurers." 649 F.Supp. at 715. There are, however, many situations in which no such recourse exists. For example, if the insured is involved in a one-car accident, or in a multiple vehicle accident for which the insured is solely at fault, there is no tortfeasor against whom subrogated PIP benefits may be asserted. Similarly, if the insured is blameless but the tortfeasor is uninsured, or if the tortfeasor is underin-

sured and other claims exhaust the limits of coverage, the insured would recover duplicate lost earnings but there would be no realistic prospect that the no-fault carrier would achieve subrogation.

Apart from the anomalous results that may flow from *Willis'* indiscriminate application of the collateral source rule, we find the policy articulation of *Willis* unpersuasive. The acknowledged no-fault goal of full and speedy recovery of special damages, *i.e.*, medical expenses and lost earnings, is not advanced by permitting double recovery under the collateral source rule. In most instances, an injured insured covered by sick benefits will promptly receive such benefits through his employer. The PIP carrier will then be expected promptly to pay the difference, if any, as State Farm has done here. Since the claim for duplicate earnings losses occurs, of necessity, after the employee-insured has already received reimbursement through her employer, the no-fault policy of reducing delay in compensation is not impaired.

In our view, the policy goals of no-fault insurance can best be served by application of principles of contract rather than tort law. The collateral source rule, with its emphasis on turning a blind eye to the prospect of double recovery so as not to confer a benefit on a wrongdoer, discourages analysis of the critical inquiry in the area of no-fault insurance: what is the actual loss for which compensation should be quickly expected without regard to fault? The answer to that question focuses not only on actual losses sustained but on the reasonable expectations of the insured. Thus, the extent to which the collateral source rule should be applied to permit double recovery should depend upon the contractual expectations that underlie the collateral source payment. Such an approach encourages examination of the source of the collateral payment rather than indifference to it.

There is no reason why a risk-averse insured should not be permitted to contract for a double recovery. If a person pays both auto and health insurance premiums, he has paid the expected value of loss due to injury in an automobile accident twice. Accordingly, if an injury occurs he should be permitted, as a matter of contract law, to receive a double recovery since that is what he has paid for. Thus, the conditions under which double recovery should be allowed may best be determined by examining the consideration that has been paid. If the insured has paid consideration for recovery from a collateral source, then recovery should be allowed. If the collateral payments are received *gratis*, then their receipt should bar recovery under the no-fault policy. In the latter instance, the insured has lost nothing, neither wages nor consideration paid to a collateral source for wage compensation. Accordingly, the insured has no loss for which his insurer should provide compensation.

Application of a contractual-consideration rule will permit payment of uncompensated losses through payment of PIP benefits without disturbing the receipt of benefits from a collateral source if the collateral benefits are supported by a specific consideration,[3] including the detriment of loss of future availability. Thus, where it can be demonstrated that the use of a wage continuation plan as the primary source of compensation for injury will result in a specific loss to the employee, either through the unavailability of such benefits in the future or the loss of any other employment benefit, the employee is entitled to recover PIP benefits. The sequence in this case clearly indicates that Nalbone received benefits under her employer's wage continuation plan prior to making a claim for PIP benefits. It is also clear that her receipt of employment benefits will not create a detriment in terms of future availability or entitlement to a cash equivalent. Under such circumstances, it cannot be said that Nalbone suffered any out-of-pocket loss for which she has not received full compensation through a combination of employer benefits and PIP payments.

---

**3.** The receipt of benefits under a separately purchased sickness or accident policy, as occurred in *Dickerson v. Continental Casualty Company,* Del.Super., C.A. No. 82C–MR–8 (Sept. 1, 1983), would not be barred under the ruling in this case.

Nalbone argues, in reliance upon *Willis*, that since the Delaware no-fault statute does not specifically bar the receipt of duplicate PIP benefits through disallowance of collateral source payments, a court should not fill the legislative void by rejecting the collateral source rule. Recently, however, this Court refused to permit application of the collateral source rule to allow an employee to achieve double recovery of medical expenses in a workmen's compensation claim. In addressing the absence of specific statutory guidance we noted that "[n]o statutory authority is required to deny recovery for losses which did not, in fact, occur or expenses not, in fact, sustained." *Guy J. Johnson Transp. Co. v. Dunkle*, Del.Supr., 541 A.2d 551, 553 (1988). Similarly, recognition of the collateral source rule to permit receipt of PIP benefits for wage losses that did not actually occur in the face of legislative silence on the subject sanctions a windfall for insureds by introducing a fault-based doctrine into a no-fault system of insurance.

We recognize that the question of the amount of detriment or consideration needed to permit collateral recovery may, at times, prove troublesome in other fact situations. There is no need to examine this question in detail to determine whether an injured party has paid a consideration equal to the risk of loss assumed by the collateral source. In our view, any consideration will support recovery, but the nature or existence of the consideration should not be based on speculation. Thus, it is speculative to argue that because an employer voluntarily agrees to provide a wage continuation plan or sick benefits, its employees suffer a detriment in the form of lower wages. The search for consideration in such a case would involve conjecture about the degree of competition in the relevant labor market and the effect of collective bargaining, or lack thereof, on the wage-benefit package achieved.

Although it appears under the stipulation of facts that there is no right of subrogation assertable in this case, we also recog-

nize that if the employer has a right of subrogation, that right cannot be barred by the PIP carrier on the ground that the employee would have no right to double recovery in ordinary circumstances. We hold that the right of subrogation is a contractual matter between the employer and the employee and is subject to the normal legal principles that govern subrogation. *Cf. International Underwriters, Inc. v. Blue Cross & Blue Shield of Del., Inc.*, Del.Supr., 449 A.2d 197 (1982).

In sum, we conclude that an insured is not entitled to recover PIP benefits as compensation for wage losses not actually sustained because of payments received from a collateral source when those payments are unsupported by actual consideration or detriment. Accordingly, Nalbone may not recover PIP benefits from State Farm to the extent that her wage loss has already been satisfied through her employer's wage continuation plan.

HOLLAND, Justice, dissenting, with whom MOORE, Justice joins:

The certified question in this case raises two issues. First, who is primarily responsible for paying Nalbone's lost wages? Second, is Mrs. Nalbone entitled to double recovery?

The following legal principles are not in dispute: (1) State Farm, like all insurers operating in this State, is required to issue policies that extend PIP benefits coextensively with the requirements of 21 *Del.C.* § 2118; (2) the language of section 2118(a)(2)a.2. mandates compensation for the net amount of lost earnings; and (3) a policy provision or coverage interpretation that does not meet the minimum requirements of the statute will not receive judicial recognition.[4]

Nalbone contends that 21 *Del.C.* § 2118 mandates payment by her no-fault insurance carrier (State Farm), for her lost earnings, irrespective of whether those losses have been compensated by a third party, her employer. State Farm concedes that

---

**4.** *Bass v. Horizon Assur. Co.*, Del.Supr., 562 A.2d 1194 (1989); *Frank v. Horizon Assur. Co.*, Del.

Supr., 553 A.2d 1199 (1989).

Nalbone is entitled to no-fault PIP benefits under its policy. However, State Farm argues that since Nalbone has received "sick pay" from her employer, the benefits of her no-fault policy are "available" but not "actually recoverable" unless her employer's plan fails to pay her lost wages in full. The majority concludes that "[t]he absence of a legislative history or prior judicial construction renders [State Farm's] argument inconclusive but the reasoning seems at least plausible." I find that State Farm's argument is inconsistent with the plain language and the purpose of 21 *Del.C.* § 2118 and prior judicial construction of its terms. *See Bass v. Horizon Assur. Co.*, Del.Supr., 562 A.2d 1194 (1989); *International Underwriters v. Blue Cross & Blue Shield of Del., Inc.*, Del.Supr., 449 A.2d 197 (1982).

In *International Underwriters*, Edward J. Stahl, Jr., incurred substantial medical expenses from injuries sustained in a motor vehicle collision attributed to the negligence of a third party. *International Underwriters v. Blue Cross & Blue Shield of Del., Inc.*, 449 A.2d at 198. Mr. Stahl's *employer* carried Blue Cross health insurance for Mr. Stahl's benefit. *Id.* Blue Cross paid Mr. Stahl's medical expenses. Blue Cross argued that, under Delaware's no-fault statute, as a matter of contract *or common* law, it was subrogated to Mr. Stahl's right to recover the medical expenses from his no-fault PIP carrier. *Id.*[5] This Court agreed. In *International Underwriters*, this Court held that the "obvious purpose of Delaware's no-fault statute § 2118 [is] to impose on the no-fault carrier ... not only primary but ultimate liability for the payment of [the insureds] covered medical bills to the extent of ... unextended PIP benefits." *International Underwriters v. Blue Cross & Blue Shield of Del., Inc.*, 449 A.2d at 200.

There is no basis to reach an opposite conclusion when the issue is the ultimate responsibility to pay lost wages rather than medical expenses, since both duties are imposed by the same statute, i.e., 21 *Del.C.* § 2118. In fact, within the last few months, this Court has held that "21 *Del.C.* § 2118(a)(2) *mandates coverage* for the expenses of medical treatment and *for lost earnings* sustained by persons injured as a result of an automobile accident." *Bass v. Horizon Assur. Co.*, 562 A.2d at 1195 (emphasis added). Unless *International Underwriters* and *Bass* are overruled, it follows that Delaware's no-fault statute, section 2118, imposes on the no-fault carrier, not only primary but ultimate liability for the insured's lost wages. If the no-fault insurance carrier is ultimately liable for Nalbone's lost wages, State Farm has no right to avoid that responsibility by setting off the amount paid by Nalbone's employer against Nalbone's claim.

State Farm argues that without a right of set off its payments would result in recovery by Nalbone pursuant to her no-fault policy *and* her employer's sick pay plan. The collateral source doctrine is recognized in Delaware and expressly allows for double recovery. To permit double recovery by Nalbone is simply an extension of the collateral source doctrine. *See Willis v. Continental Cas. Co.*, 649 F.Supp. 707, 715 (D.Del.1986).

The focus of the collateral source rule is upon the transaction between the plaintiff and defendant. Any receipt of a collateral payment before or after the tortious act is irrelevant.[6] In Nalbone's case, the focus must be on the statutory duty of the no-fault carrier. The statute imposes ultimate liability upon the no-fault carrier to pay for Nalbone's lost wages. There is no provision in the statute to set off collateral payments and no statutory prohibition against double recovery by Nalbone.

In fact, the majority acknowledges that Mrs. Nalbone would be entitled to double recovery if she had paid independent con-

---

5. In this case, the parties have stipulated that Nalbone's employer has no right of subrogation against State Farm.

6. *Yarrington v. Thornburg*, Del.Supr., 205 A.2d 1, 2 (1964) held, "[t]he collateral source doctrine is predicated upon the theory that a tortfeasor has no interest in, and therefore no right to benefit from monies, received by the injured person from sources unconnected with the defendant." Whether collateral source payments or services received by the victim are gratuitous or result from a prior contractual relationship, such as insurance, their source is immaterial in calculating the damages owed by the tortfeasor.

sideration for duplicative coverage. However, the majority concludes that Mrs. Nalbone's employer has gratuitously provided her with sick pay. Conversely, I find that the sick pay plan was provided to Nalbone by her employer in consideration for her services as an employee. This Court has acknowledged that the terms and conditions of an employer's fringe benefit plan plays an " 'important role in inducing a [person] to enter or continue in the service of that employer. In other words, it is a part of the consideration for the contract of hire.' " *Gow v. Director of Revenue*, Del. Supr., 556 A.2d 190, 193 (1989) (quoting *Dorsey v. State of Delaware ex rel. Mulrine*, Del.Supr., 301 A.2d 516, 518 (1972)). *See In re State Employee's Pension Plan*, Del.Supr., 364 A.2d 1228, 1234 (1976).

If a tortfeasor were involved in this case, State Farm would be obligated to pay Nalbone's lost wages and would be expressly subrogated to Nalbone's right of recovery from the tortfeasor. 21 *Del.C.* § 2118(f). In such a situation, Nalbone would receive double recovery. The absence of a tortfeasor does not change Nalbone's right to recover from State Farm. It simply eliminates State Farm's right of subrogation. If the General Assembly desires to give a no-fault carrier a right to set off payments made by a collateral source, in the absence of a right of subrogation against a tortfeasor, it can do so expressly by amending the statute. *See, e.g.*, Fla.Stat. § 627.7372 (1984). However, the purpose and language of the existing statute are directed toward maximizing prompt payment to the insured not minimizing payments by the insurer.

The majority states that "the question of the amount of detriment or consideration needed to permit collateral recovery may, at times, prove troublesome in other fact situations." [7] The problems created by reading a right of set off for collateral

payments into the statute can be illustrated by a hypothetical situation. If Mrs. Nalbone has a co-worker who is injured in a similar automobile accident in the future, what will happen if the employer has not paid the lost wages before a PIP claim is filed? Can State Farm make partial payment and tell the second employee to collect the balance from the employer or is State Farm obligated to make payment in full since no collateral payments have been made? State Farm's obligation to make primary and ultimate payment for lost wages is set forth in the statute. The statutory obligation of the no-fault carrier exists independent of the insured's right to collect from a collateral source and it certainly cannot depend on the happenstance of who pays first. If the timing of the payment were determinative of the amount of State Farm's obligation, no collateral source would ever pay first.

The purpose of the no-fault statute is to provide for the prompt payment of lost wages by the insurance carrier. If the PIP carrier is permitted to inquire into the nature of a collateral source of payment, promptness is eliminated. If State Farm's position in this case prevails, litigation with one's own no-fault carrier will replace prompt payment. If the no-fault carrier can set any collateral payment off against its own obligation, the purpose of the statute, to make it ultimately responsible, is defeated. State Farm's argument is contrary to the public policy which is articulated in the no-fault statute and should be rejected. *See State Farm Mut. Auto. Ins. Co. v. Wagamon*, Del.Supr., 541 A.2d 557 (1988).

I respectfully dissent.

---

7. The presence or absence of consideration should not be determinative. In *Campbell v. Brandenburger*, Del.Super., 162 A. 354, 356 (1932), cited in *Yarrington*, the Superior Court stated:

[T]he mere fact that the [Sewer Department], by which the plaintiff was employed when he was injured, as a mere gratuity and without the performance of any services whatever by

the plaintiff, or any understanding with him that such sums should be repaid, continued to give him an amount equivalent to his previous weekly wages during the whole period that he was unable to work, would not relieve the defendant of his liability to reimburse plaintiff for such actual loss of time and wages as were caused by the defendant's negligent act. (citations omitted).