**Walter LOMAX, Sr., Administrator of the Estate of Walter Lomax, Jr., Plaintiff,**

v.

**NATIONWIDE MUTUAL INSURANCE COMPANY, Defendant.**

**Civ. A. No. 88–300 LON.**

United States District Court, D. Delaware.

Aug. 15, 1991.

Eliot Alazraki and Gary S. Nitsche of Eliot Alazraki, P.A., Wilmington, Del., for plaintiff.

Mason E. Turner, Jr. of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for defendant.

## OPINION

LONGOBARDI, Chief Judge.

This is a civil action based on diversity of citizenship brought by Plaintiff Walter Lomax, Sr., administrator of the Estate of Walter Lomax, Jr., against Defendant Nationwide Mutual Insurance Company ("Nationwide"). Plaintiff seeks damages for Defendant's alleged bad faith refusal to arbitrate on the reformed uninsured motorist policy of Kenneth E. Murrey. Plaintiff has moved for summary judgment claiming that no genuine issues of material fact exist and that the Plaintiff is entitled to judgment as a matter of law.

## I. FACTS

On November 27, 1980, Walter Lomax, Jr. was injured and later died as a result of injuries sustained in an automobile accident while permissibly driving a friend's motor vehicle. Docket Item ("D.I.") 17 at 3. The friend, Kenneth E. Murrey, had purchased a Delaware automobile insurance policy from Defendant Nationwide which was in effect on the date of the accident. The policy provided $100,000 per person/$300,000 per accident bodily injury liability coverage and $10,000 per person/$20,000 per accident uninsured motor-

ist ("UM") coverage. D.I. 17A, Exhibit A. Walter Lomax, Jr. was an additional insured for UM coverage as a permissive user under Murrey's policy with Defendant and thus had a claim for UM benefits under that policy.

On September 15, 1982, the administrator of the Estate of Walter Lomax, Jr. filed suit against Nationwide in Pennsylvania state court. D.I. 20 at 2. Nationwide removed the case to the United States District Court of the Eastern District of Pennsylvania which dismissed the suit and denied a motion by Murrey to intervene. *Lomax v. Nationwide Insurance Co.*, C.A. No. 83–1621, Lord, J. (E.D.Pa. Jan. 30, 1985), D.I. 17A at A–19, *aff'd, Lomax v. Nationwide Insurance Co.*, 779 F.2d 43 (3rd Cir.1985) (estate lacked standing to reform insurance contract). D.I. 17A at A–20. On June 23, 1986, Murrey filed suit in the United States District Court for the District of Delaware against Nationwide seeking to reform his insurance contract to provide increased uninsured motorist coverage.[1] D.I. 17 at 4.

The District Court held that, either under Delaware or Pennsylvania statutes of limitation, the reformation action was timely. *Murrey v. Nationwide Ins. Co.*, 674 F.Supp. 154, 156–58 (D.Del.1987). The Court also found that Murrey had standing to reform his policy and was not collaterally estopped from asserting his right to reformation by the denial of his interven-

---

1. Section 3902 of the Delaware Insurance Code requires insurers to provide uninsured motorist coverage to Delaware residents and to offer policy holders certain minimum coverage. Mr. Murrey alleged that Nationwide violated the statute by failing to offer him increased UM benefits and that he should be able to reform his policy retroactively to provide for the increased coverage. The pertinent part of the statute in effect at the time of the accident (the 1974 statute as amended in 1978) states:

 (a) No policy insuring against liability arising out of the ownership, maintenance or use of any motor vehicle shall be delivered or issued for delivery in this State with respect to any such vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured or hit-and-run

motor vehicles for bodily injury, sickness, or disease, including death, or personal property damage resulting from the ownership, maintenance or use of such uninsured or hit-and-run motor vehicle.... The coverage herein required may be referred to as "uninsured vehicle coverage."

 (b) The amount of coverage to be so provided shall not be less than the minimum limit for bodily injury, death and property damage liability insurance provided under the motorist financial responsibility laws of this State.... Each insured shall be offered the option to purchase additional coverage for personal injury or death up to a limit of $300,000 but not to exceed the limits for personal injury set forth in the basic policy.
 As used herein, the term "property damage" shall include the loss of the use of a vehicle.
 18 Del.C. § 3902(a), (b) (1974 & Cum.Supp. 1986) (amended 1982, 1984).

tion motion in the Pennsylvania litigation. *Id.* at 160–61. On February 18, 1988, Nationwide made an offer of judgment to permit Murrey to retroactively increase the limits of his UM coverage from $10,000 per person/$20,000 per accident to $100,000 per person/$300,000 per accident.

On May 2, 1988, following Murrey's acceptance of Nationwide's offer of judgment, Plaintiff's counsel made a demand on Nationwide in behalf of the Estate for arbitration to obtain the reformed policy limits. D.I. 17 at 6. On June 1, 1988, Plaintiff filed suit against Nationwide in United States District Court for the District of Delaware seeking an order compelling arbitration and seeking damages for Nationwide's refusal to arbitrate. D.I. 1.

Plaintiff has filed a motion for partial summary judgment on the grounds that contrary to Nationwide's affirmative defense assertions, the present action is not barred by the applicable statute of limitations, collateral estoppel and/or *res judicata.* The Plaintiff also seeks partial summary judgment on the grounds that the Defendant is obligated to provide UM benefits to the Plaintiff based on the reformed Murrey policy and that Plaintiff is not prohibited from recovery by exclusionary language in the Murrey policy or by the operation of 12 Del.C. § 2102.

## II. SUMMARY JUDGMENT

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact that can be resolved at trial and that the moving party is entitled to a judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Materiality is determined by the substantive law which governs the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this inquiry, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

Following a determination that no disputes of material facts exist, the moving party must demonstrate that it is entitled to judgment as a matter of law. If the moving party bears the burden of proof at trial, then his burden on summary judgment is to make a showing sufficient to establish the existence of every element essential to his case. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

■ Once the moving party has made and supported his motion, the "adverse party may not rest upon mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Issues of fact will be resolved against the moving party and all inferences to be drawn from the material it submits will be viewed in the light most favorable to the party opposing the motion. *Norfolk Southern Corp. v. Oberly,* 632 F.Supp. 1225, 1231 (D.Del.1986) (citing *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)), *aff'd* 822 F.2d 388 (3rd Cir.1987). If the evidentiary record supports a reasonable inference that the ultimate facts may be drawn in favor of the responding party, then the moving party cannot obtain summary judgment. *In re Japanese Electronic Products,* 723 F.2d 238, 258 (3rd Cir.1983), *rev'd on other grounds,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

■ In analyzing the legal issues raised in this motion, the Court recognizes that a federal court sitting in a diversity action must apply the substantive law of the state in which it sits. *Brown v. Caterpillar Tractor Co.,* 696 F.2d 246, 249 (3rd Cir.1982); *Becker v. Interstate Properties,* 569 F.2d 1203, 1204 (3rd Cir.1977), *cert denied,* 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978). If there is no ruling by the state's highest court, then the federal court must "apply what they find to be the state law after giving 'proper regard' to the relevant rulings of other courts of the state." *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967); *First Nat. State Bank of N.J. v. Comm. Federal Savings & Loan*

*Assoc.,* 610 F.2d 164, 172 (3rd Cir.1979). When state law is unclear, the District Court must predict how the state's highest court would resolve the issue. *Rabatin v. Columbus Lines, Inc.,* 790 F.2d 22, 24 (3rd Cir.1986); *McGowan v. University of Scranton,* 759 F.2d 287, 291 (3rd Cir.1985).

## A. Collateral Estoppel and/or Res Judicata

### 1. *Collateral Estoppel*

■ Collateral estoppel or "issue preclusion"[2] involves foreclosing relitigation of a matter that has been litigated and decided. *See Restatement (Second) of Judgments,* Introductory Note to Chapter 3; 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4402 (1982). In Delaware, there are four requirements for a finding of issue preclusion: (1) the issue in the instant case must be identical to the issue concluded in the earlier action; (2) the issue must have been actually raised and fully litigated in the prior action; (3) the issue must have been material and relevant to the disposition of the prior action; and (4) the determination of the issue in the prior action must have been necessary and essential to the resulting judgment. *See Neoplan USA Corp. v. Taylor,* 604 F.Supp. 1540, 1546 (D.Del. 1985); *In re Asbestos Litigation (Lee),* Del.Super., 517 A.2d 288, 292–93 (1986); *Chrysler Corp. v. New Castle County,* Del.Super., 464 A.2d 75 (1983). *See also Continental Cas. Co. v. Anne Arundel Com. College,* 867 F.2d 800, 802–03 (4th Cir.1989) (discussing Delaware law).

In the present case, it is unnecessary to examine all of the factors as the issue of whether the Plaintiff was entitled to UM benefits was never "actually litigated and fully determined in the first proceeding." *Auerbach v. Cities Service Company,* Del.Super., 134 A.2d 846, 851 (1957). The prior action was dismissed by the District Court and then affirmed by the Third Circuit on the ground that, under Pennsylvania law, "one who is neither a party to an insurance contract nor in privity with such a party lacks *standing* to reform an insurance contract." *Lomax v. Nationwide Insurance Co.,* 779 F.2d 43 (3rd Cir.1985). Because the prior action was dismissed prior to addressing and fully litigating the underlying substantive issues, it is clear that collateral estoppel is inapplicable in the present case. *See Dofflemyer v. W.F. Hall Printing Co.,* 558 F.Supp. 372, 380 (D.Del.1983) (same issue of fact to be determined must have been previously litigated). Accordingly, Plaintiff's motion for partial summary judgment on the ground that collateral estoppel is inapplicable to the present action is granted.

### 2. *Res Judicata*

■ *Res judicata* or claim preclusion permits "a final judgment upon the merits rendered by a court of competent jurisdiction [to] be raised as an absolute bar to the maintenance of a second suit in a different court upon the same matter by the same party or his privies." *Epstein v. Chatham Park, Inc.,* Del.Supr., 153 A.2d 180, 184 (1959); *Brady v. C.F. Schwartz Motor Co., Inc.,* 723 F.Supp. 1045, 1047 (D.Del.1989); *Neoplan USA Corp.,* 604 F.Supp. at 1544. The policy behind claim preclusion doctrine is society's overriding interest in reaching a final resolution in legal controversies. *See Meding v. Hurd,* 607 F.Supp. 1088, 1100 (D.Del.1985). This principle, however, "must be tempered by considerations of fairness and should receive cautious adherence to avoid arbitrary results." *Id.*

■ Claim preclusion may not be invoked unless the judgment rendered by the prior court was on the merits. Standing, like mootness and lack of subject matter jurisdiction, is a question of justiciability not involving an adjudication on the merits.

**2.** In accordance with the definitions laid out by the Supreme Court in *Migra v. Warren City School Dist. Bd. of Ed.,* 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984), this opinion will refer to collateral estoppel as issue preclusion and *res judicata* as claim preclusion. Issue preclusion, as defined by the Court in *Migra,* is "the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided." *Id.* at 77 n. 1, 104 S.Ct. at 894 n. 1. Claim preclusion, on the other hand, refers to preclusive effect of a judgment in foreclosing litigation of matters that should have been raised in an earlier suit." *Id.*

*Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) (stating that "standing in no way depends on the merits of the plaintiff's contention"); *McCarney v. Ford Motor Co.*, 657 F.2d 230, 232–34 (8th Cir.1981) (determination of standing issue does not reach merits and is quasi-jurisdictional in nature). Thus, the dismissal of Plaintiff's claim in the Pennsylvania action on the ground of standing cannot preclude his claim in the present action. 1B *Moore's Federal Practice* ¶ 0.409[1.–2] at 315 (2d ed. 1988); *see also Cutler v. Hayes*, 818 F.2d 879, 888 (D.C.Cir.1987) (standing is a question of justiciability and jurisdiction which may preclude litigation of the precise issues of jurisdiction already litigated but not the claim itself); *Haefner v. City of Lancaster, Pa.*, 566 F.Supp. 708, 710 (E.D.Pa.1983) (dismissal based on failure to establish a "precondition requisite" cannot support a *res judicata* bar). Consequently, Plaintiff's partial motion for summary judgment on the ground that *res judicata* is inapplicable to the present action is also granted.

## B. Statute of Limitations

Plaintiff seeks partial summary judgment on the ground that his claim is not barred by the statute of limitations. As a preliminary matter, Defendant argues that the insurance contract establishes the limitation for the bringing of an UM claim as follows: "Under the uninsured motorist coverage, any arbitration or legal action against the company must begin within the time limit allowed for bodily injury or death actions in the state where the accident occurred."

As the accident occurred in the Commonwealth of Pennsylvania, Defendant contends that there is a two year limitation for the bringing of personal injury or death actions. *See* 42 Pa.C.S.A. § 5524. Plaintiff concedes that contractual provisions establishing time limitations less than the applicable Delaware statute of limitations are enforceable unless in violation of a

specific statutory provision proscribing them. *See, e.g., Betty Brooks v. Ins. Placement Facility*, Del.Supr., 456 A.2d 1226, 1228 (1983); *Closser v. Penn Mut. Fire Ins. Co.*, Del.Supr., 457 A.2d 1081, 1083 (1983); *Rumsey Elec. Co. v. University of Delaware*, Del.Supr., 358 A.2d 712 (1976). As there is no relevant statutory proscription, the two year limitation is enforceable and the only remaining issue is when the action accrued for the purpose of determining when the two year period began to run.

Defendant asserts that the present action began to accrue for statute of limitations purposes either on the date of the accident, November 27, 1980, or on the date upon which the Plaintiff first made a demand for UM benefits and was denied by the insurer, April 29, 1983. Defendant contends that, because the Plaintiff did not file the present action until June 1, 1988, Plaintiff's suit is barred on either accrual date.

 It is well settled in Delaware that a claim for uninsured motorist benefits does not arise until the insurance company denies the insured's claim for coverage benefits and so informs the insured. *See, e.g., Allstate Ins. v. Spinelli*, Del. Supr., 443 A.2d 1286, 1292 (1982). This principle is based on the generally accepted view that actions based on UM coverage claims are contract actions and that contract principles apply. *Id.* at 1290 (citations omitted). As UM benefits are "not embraced within the no-fault concept of an immediately assertable right ... a claim for uninsured motorist benefits, by its very nature, becomes 'operative,' not upon the occurrence of the motor vehicle accident, but only after the claimant-insured has established that he/she is 'legally entitled to recover damages'...." *Id.* at 1291. Consequently, contrary to Defendant's assertions, the present action could not have arisen when the accident occurred but rather when the Plaintiff could first bring a successful suit to recover damages.[3] *See*

3. When an insurer fails to offer additional UM coverage as required by 18 Del.C. § 3902(b), the "insurer is deemed to have made to the insured a continuing offer of such additional coverage which offer remains open even after an accident occurs, absent compliance with section 3902(b)." *Whaley v. Allstate Ins. Co.*, 595 F.Supp. 1023, 1027–28 (1984) (emphasis omit-

*also Kucera v. Metropolitan Life Ins. Co.,* 719 F.2d 678, 681 (3rd Cir.1983) (stating that "[i]t is a rule of general application that a cause of action accrues for limitations purposes only when it could be prosecuted to a successful conclusion.").

The above analysis is consistent with basic principles of limitations law which state that "a cause of action does not accrue before the right to institute a suit arises." *Dofflemyer v. W.F. Hall Printing Co.,* 558 F.Supp. 372, 379 (D.Del.1983). It is also well-settled that the statute of limitations on a contract claim does not begin to run until the date of contract breach. As a necessary corollary to the above principles, the statute of limitations on a reformed contract cannot begin to accrue until the reformed contract comes into existence and the right to institute suit on breach of that contract occurs.

In the instant case, Plaintiff could not have instituted suit on the reformed contract until, at the very earliest, it was reformed by the District Court on February 12, 1988. Because Plaintiff filed suit on June 1, 1988, less than four months after the District Court's decision, the present action was timely. Plaintiff's motion for partial summary judgment on the ground that Plaintiff's claim is not time-barred is hereby granted.

## C. Retroactive Benefits

 Plaintiff seeks partial summary judgment on the ground that he is entitled to the UM benefits as reformed under Murrey's insurance policy. Defendant contends that Delaware law does not recognize the right of a stranger to an insurance contract to secure the benefits of the reformation which are personal to the policyholder. The Court finds Defendant's argument totally unsubstantiated and contrary to basic tenets of contract law.

The cases cited by the Defendant, *Menefee v. State Farm Mutual Auto. Ins. Co.,* Del.Super., C.A. No. 84C–AP–84, Balick, J. (May 28, 1986), D.I. 17, Exhibit B, 1986 WL 6590; *Starr v. Nationwide Mut. Ins. Co.,* Del.Ch., 548 A.2d 22 (1988), and related cases, simply support the proposition that standing to reform uninsured motorist coverage belongs solely to the contracting parties and not that only the insured may seek benefits under the reformed contract. In *Menefee,* the Delaware Superior Court held that, prior to reformation under section 3902, "there is no contract, but only the right to create a contract. That right belongs to the person who contracted for the insurance in the first place, not to someone who would be covered under the policy if the contracting party exercises that right." D.I. 17, Exhibit B at 3. The *Menefee* court recognized that the insured party may have countervailing considerations such as "the cost of the premiums for the period for which additional coverage would be retroactively provided and the effect of the claim on later premiums" that persuade the insured not to retroactively seek additional coverage benefits. *Id.*

Simply put, the *Menefee* court held that third parties who have claims under an unreformed contract cannot unilaterally reform the contract to the detriment of the insured. This proposition, however, is not the same as holding that any benefits secured under the reformed contract belong solely to the insured party.

In addition, the legislative intent embodied in section 3902 is that innocent Delaware motorists will be placed in the same position as if the negligent uninsured motorist carried the same liability coverage as they. *See, e.g., Adams v. Delmarva Power & Light Co.,* Del.Supr., 575 A.2d 1103, 1106 (1990); *O'Hanlon v. Hartford Acc. & Indem. Co.,* 439 F.Supp. 377, 383 (D.Del. 1977), *rev'd on other grounds,* 639 F.2d

ted) (citing *State Farm Mut. Auto. Ins. Co. v. Arms,* Del.Supr., 477 A.2d 1060, 1064 (1984)). If the insurer fails to comply with section 3902(b), the continuing offer will be deemed to have been accepted when the insured makes "a demand for additional UM coverage even though the demand was made after the accident."

*Whaley,* 595 F.Supp. at 1028. Thus, the reformed contract could not have come into existence until Murrey accepted the continuing offer of additional coverage by making a demand for the additional coverage and being denied that coverage by Nationwide.

1019 (3rd Cir.1981). In the instant case, it is undisputed that Murrey chose to safeguard himself against such an eventuality and that the decedent was an additional insured under his policy.[4] Clearly, the decedent was included in the class of innocent Delaware motorists envisioned by the uninsured motorist statute. It would thus be contrary to legislative intent and common contract principles to find that decedent's rightful claim under the Murrey policy was somehow precluded by the mere fact that the amount of coverage available under the policy was increased to comply with a statutory minimum. Plaintiff's motion for partial summary judgment on the ground that Plaintiff is entitled to recover from the reformed Murrey policy is granted.

D. Double Recovery

Defendant Nationwide asserts that because decedent's medical bills were previously paid pursuant to a health insurance plan maintained by the decedent's employer, exclusionary language in the Murrey policy precludes the Plaintiff from recovering a "duplicate" payment of these expenses. Defendant also contends that as the medical bills were paid by another insurer they are not legal obligations of the Estate pursuant to section 2102 of the Delaware Code and that any payment by the Defendant would amount to a double recovery. Plaintiff seeks partial summary judgment on the grounds that the above defenses are inapplicable to the present case. Plaintiff also seeks partial summary judgment on the ground that Delaware's collateral source rule allows "double" recovery of decedent's medical bills. The Court will address each of these contentions in turn.

1. *Exclusionary Clauses*

■ Defendant argues that several exclusionary clauses contained within the Murrey policy preclude Plaintiff's duplicate recovery of decedent's medical expenses. The first such exclusionary clause provides that: "Uninsured Motorists limits will be

reduced by any sums paid by or for any liable parties, and by any sums paid or payable under workmen's compensation, disability benefits, or similar laws." D.I. 17A at 11. Defendant argues that because decedent received "disability" benefits under his employer's group health insurance plan, any payment received will reduce the limits of available UM coverage.

This particular reducing clause has been construed by the Delaware Chancery Court to be invalid and void as against public policy, at least when applied to the receipt of worker's compensation benefits. *See Jeanes v. Nationwide Ins. Co.*, Del.Ch., 532 A.2d 595, 600 (1987). Whether the remainder of the clause is also void, however, is a question that the Court does not have to reach because it is clear that the language "workmen's compensation, disability benefits, *or similar laws*" unambiguously refers to payments received or receivable under some sort of statutory mandate and not an employer's voluntary group health plan. *See, e.g., Britton v. Safeco Ins. Co.*, 104 Wash.2d 518, 707 P.2d 125, 131–32 (1985) (enforcing reducing clause where plaintiff received disability benefits under Washington's Law Enforcement Officers' and Fire Fighters' Retirement System Act). Accordingly, the Court finds Defendant's first reducing clause inapplicable.

The second and third reducing clauses, commonly known as "other insurance" set-offs, provide:

OTHER INSURANCE If you have other insurance:

1. For bodily injury suffered by an insured while occupying a motor vehicle you do not own, we will pay the insured loss not covered by other insurance.

2. Except as stated in the preceding paragraph, in any occurrence in which other insurance similar to that provided in this coverage is available under a policy issued by another company, we will be liable for only our proportional share of the loss. This share will be determined by our proportion of the total insurance

---

**4.** The relevant portion of Murrey's UM coverage states: "Relatives living in your household also are covered for bodily injury damages under

this coverage. *Anyone else* is protected while occupying: 1. your auto."

available. Total damages in any such occurrence will be considered not to exceed the highest limits in any one of all policies applicable.

D.I. 17A at 11.

The first "other insurance" clause is what is commonly known as an "excess" coverage limitation and is typically drafted by an insurance company to encompass situations where the policyholder rides as a passenger in a vehicle which he or she does not own. Because in most cases the operator of the vehicle will carry a separate UM policy applicable to bodily injury suffered by the policyholder, problems will arise as to the respective liabilities of the two UM insurance carriers. 8C *Appleman on Insurance*, § 5101. The function of the "excess" insurance clause is to apportion primary liability on the operator's UM carrier and render the passenger's UM carrier liable only for excess injury. *See Id.* and cases cited therein.

In the instant case, Defendant argues that because the insured's medical bills have already been paid by other insurance, there is no excess loss for which Defendant could be held liable. The Court notes, however, that consistent with the discussion above, Murrey's insurance policy explicitly defines the words "YOU" or "YOUR" to "mean or refer to the policyholder first named in the attached Declarations, [i.e. Murrey] and include that policyholder's spouse if living in the same household." D.I. 17A at 2. Thus, according to its own clear and unambiguous terms, the clause only applies if an insured, in this case the decedent, is injured in a motor vehicle that Murrey does not own. Because it is uncontested that decedent suffered bodily injury while permissibly driving Murrey's car, the excess insurance clause is facially inapplicable.

The second "other insurance" clause is what is commonly known as a "pro rata" coverage limitation. Under this type of insurance clause, the drafter of the insurance contract seeks to limit its coverage exposure to a pro rata share of the limits of the policy providing the highest liability coverage. 8C *Appleman on Insurance*, § 5102. This type of limitation has been invalidated as against Delaware public policy, at least as it applied to an insurer's attempt to limit its exposure to the limits of the policy with the highest liability coverage. *See Jeanes*, 532 A.2d at 601 (finding that insureds may "stack the coverages available to them, if the actual damages, as may be eventually determined, exceed the limits of one or more policies.").

In the case *sub judice*, the Court believes that Defendant's pro rata clause, if it has any remaining effect at all, would merely resolve coverage problems between various uninsured/underinsured carriers so that they will share in a common loss, as would be the result under equitable principles of contribution. The Court's interpretation is guided primarily by the language of the pro rata clause itself which expressly states that it applies to "other insurance *similar to that provided in this coverage* ...." D.I. 17A at 11 (emphasis supplied). Because the limitation appears in a section of the insurance contract titled "amounts payable for uninsured motorist losses", the Court can only conclude that the language is referring to other uninsured motorist insurance. *See also, Krutz v. Harleysville Mut. Ins. Co.*, 766 F.Supp. 219 (D.Del.1991) (interpreting an analogous pro rata provision to determine the respective liabilities of two UM carriers). To the extent that other "similar" insurance could reasonably be interpreted to include similar benefits, i.e., reimbursement for medical expenses, the language is ambiguous and must be strictly construed against the drafter, Nationwide. *Hallowell v. State Farm Mutual Auto. Ins. Co.*, Del.Supr., 443 A.2d 925 (1982); 8C *Appleman on Insurance* § 5609. Based on the foregoing, the Court finds Defendant's "pro rata" coverage limitation is either void as against public policy or inapplicable to medical payments made pursuant to an employer's group health insurance plan.

Accordingly, because all the reducing clauses containing exclusionary language are either void as against public policy or facially inapplicable to the instant case, Plaintiff's motion for partial summary

judgment on the ground that Defendant's exclusionary language does not bar recovery of decedent's medical bills is hereby granted.

### 2. *Debts of and Claims Against a Decedent Estate*

█ Defendant's second argument is that because decedent's medical bills were paid by his health insurer and thus never submitted to the Estate in accordance with section 2102 of the Delaware Code, the bills are not a legal obligation of the Estate. Section 2102 provides in a pertinent part that:

> (a) All claims against a decedent's estate which arose before the death of the decedent ... are barred against the estate, if not barred earlier by other statutes of limitations, the personal representative and the heirs and devisees of the decedent, unless within 6 months from the granting of letters to the executor or administrator notice is given in compliance with § 2104 of this title or unless notice is presumed under § 2103 of this title.

12 Del.C. § 2102 (1987).

It is undisputed that the purpose of section 2102 is to compel claimants with demands against an estate to present their claims within a specified statutory period so that the decedent's estate can be settled within a reasonable time. *Gwaltney v. Scott*, Del.Supr., 195 A.2d 247 (1963). It is also undisputed that Prudential Insurance Company paid decedent's medical expenses and, therefore, the bills were not submitted to the Estate in accordance with section 2102. What is disputed, however, is whether Defendant may step into decedent's shoes and turn what is undeniably a shield barring the presentation of seriatim claims against the Estate into a sword cutting off decedent's right to pursue a purportedly independent contractual obligation owed to the Estate. The Court thinks not, particularly given Defendant's failure to cite any legal support for its novel interpretation of the statute. Accordingly, the Court grants Plaintiff's motion for partial summary judgment on this issue and turns to Plaintiff's final contention, whether or not Delaware's collateral source rule applies to Plaintiff's "double" recovery of his medical expenses.

### 3. *Collateral Source Rule*

█ Plaintiff's final contention is that Delaware's collateral source rule applies to Uninsured Motorist contracts and thus Plaintiff is entitled to duplicate recovery of decedent's medical expenses. The collateral source rule was first adopted by the Delaware Supreme Court in *Yarrington v. Thornburg*, Del.Supr., 205 A.2d 1 (1964), where it held that the "collateral source rule is predicated upon the theory that a tortfeasor has no interest in, and therefore no right to benefit from, monies received by the injured person from sources unconnected with the defendant." *Id.* at 2. Under this formulation, the source of the collateral payments received by the victim whether gratuitous or by insurance contract are immaterial in calculating the damages owed by the tortfeasor. *Willis v. Continental Ins. Co.*, 649 F.Supp. 707, 714 (D.Del.1986).

█ The question of whether the collateral source rule applies to UM recoveries is one of first impression in Delaware. Because there is no relevant Delaware caselaw, the Court's resolution of this question must turn on how the Delaware Supreme Court would interpret the appropriate operative language in the UM statute. The statute provides in pertinent part that UM coverage is "for the protection of persons insured thereunder who are legally entitled to recover damages from the owners or operators of uninsured or hit-and-run vehicles...." 18 Del.C. § 3902(a). Plaintiff essentially argues that because he would be "legally entitled" to recover decedent's medical expenses from the tortfeasor by virtue of the collateral source rule, he is legally entitled to recover those expenses from his UM carrier.

The Court is unpersuaded by such a simplistic theory of recovery. As a preliminary matter, two Delaware state court decisions very strongly indicate that not every principle related to legal entitlement in

the tort context will be applied with equal force in the UM context. The first case is the previously discussed *Spinelli* decision in which the Delaware Supreme Court held that because a UM action essentially sounds in contract rather than tort, the timeliness of a suit for UM benefits is controlled by 10 Del.C. § 8106, Delaware's three-year statute of limitations for breaches of contract, rather than 10 Del.C. § 8119, Delaware's two-year statute of limitations controlling tort claims for personal injury. *Spinelli*, 443 A.2d at 1287. Thus, an insured who files a claim against a UM carrier more than two years after an accident but less than three years after the contract breach cannot be denied recovery despite the fact that the insured is no longer "legally entitled to recover damages" from the tortfeasor due to Defendant's two-year tort statute of limitations.

Similarly, in *Grissom v. Nationwide Mut. Ins. Co.*, Del.Ch., C.A. 11316, 1991 WL 101851, Hartnett, V.C. (Jun. 10, 1991), the Chancery Court recently held that despite an insured's legal entitlement to recover punitive damages from a grossly negligent tortfeasor, such damages are unavailable under the UM statute. The Chancery Court reasoned that the UM statute:

> obligates the insurer to pay compensatory damages for injuries to the insured, up to the amount of policy coverage. Compensatory damages are granted to provide satisfaction for an injury done. The purpose of the coverage is to make the plaintiff whole by focusing on the injuries or losses sustained.... Nothing in the statute, however, mandates coverage for punitive damages. Punitive damages serve an entirely different function than compensatory damages and are calculated according to a different formula. Their purpose is to implicate social policies. The purpose of punitive damages is to punish a wrongdoer and they are calculated by the enormity of his offense.

*Grissom*, C.A. 11316, slip op. at 8–9 (citations omitted).

After concluding that the compensatory goals of UM coverage are not advanced through the assessment of punitive dam-age awards, the *Grissom* court then examined the public policy goals of punitive damages, namely punishment and deterrence, to determine whether these goals could be promoted through the imposition of a punitive damage award in the UM context. *Id.* at 9. The court found that in the case of a liability insurer, an award of punitive damages may be passed along to the tortfeasor in the form of higher insurance premiums or the loss of insurance coverage altogether. The court then stated that this would not be the case in a UM coverage action, however, because the insured is proceeding against his or her own insurance carrier. Consequently, the *Grissom* court concluded that "neither the punishment nor the deterrent function of punitive damages would be achieved if an insurer who is required to provide uninsured coverage is also required to pay punitive damages because the uninsured motorist carrier could not pass the 'punishment' along to the wrongdoer as in liability coverage." *Id.* at 11.

Based on the foregoing analysis, it is clear to the Court that the application of tort principles to the UM context is a problematical proposition which must be conducted on a case-by-case basis. Moreover, as indicated in the *Spinelli* and *Grissom* decisions, both the purpose of the UM statute and the tort principle to be applied must be carefully evaluated to determine if the resulting overlap is logical and consonant with legislative intent. In the case *sub judice*, because it is uncontested that Plaintiff has been fully compensated for decedent's injuries, it would appear that any application of the collateral source rule to the present facts would fail to advance the compensatory goal of UM coverage. Second, as recently observed by the Delaware Supreme Court, "[t]he rationale for the collateral source rule appears to emphasize the deterrent and quasi-punitive functions of tort law." *State Farm Mut. Auto. Ins. v. Nalbone*, Del.Supr., 569 A.2d 71, 73 (1989). Thus, if the collateral source rule is to be applied at all in the UM context, it should at the very least arguably advance the dual public policy goals of deterrence and punishment.

As with the award of punitive damages in the UM context, however, the application of the collateral source rule to uninsured motorist contracts cannot deliver on this promise. Because UM coverage is most appropriately characterized as a two-party contractual relationship between the insurer and insured, the tortfeasor will not be deterred or punished for his actions by virtue of the application of the collateral source rule to Plaintiff's own insurance carrier. Moreover, despite language to the effect that an UM carrier stands in the shoes of the uninsured motorist, "the insurer has, in fact, done nothing morally or legally culpable [and thus,] is not a 'wrongdoer' within this equation." *Britton*, 707 P.2d at 132. Finally, as stated by the *Grissom* court, an award of damages "where no punishment or deterrent effect can be achieved, as here, would therefore be an absolute windfall to the plaintiff. Courts do not favor unjust enrichment." *Grissom*, C.A. 11316, slip op. at 9 (citations omitted).

Ignoring the public policy goal of compensation, Plaintiff argues that an analysis of the collateral source rule's punitive and deterrent functions is irrelevant because the public policy objective underlying the UM statute is to "mak[e] available coverage that mirrors liability insurance through the purchase of uninsured motorist coverage." *Aetna Casualty and Surety Co. v. Kenner*, Del.Supr., 570 A.2d 1172, 1175 (1990). Plaintiff contends that the "mirror" public policy concept underlying the UM statute would be impaired if Plaintiff were not allowed to recover the same amount that he would have recovered from the tortfeasor had that tortfeasor been fully insured.

The Court finds, however, that while the Delaware Supreme Court has endorsed the "mirror" concept as it applies to the UM statute, it has done so only in the following context:

[T]he public policy underlying section 3902 is to permit an insured to protect himself from an irresponsible driver causing injury or death. This public policy is achieved by making available coverage that mirrors his liability insurance through the purchase of uninsured motorist coverage. Thus, while the insured's basic liability coverage allows him to create a fund to indemnify losses arising from his own negligent acts, uninsured/underinsured coverage permits him to establish a fund of the same value to protect against losses caused by drivers who carry less liability coverage. When a motorist who carries full uninsured/underinsured coverage takes to the highways, he knows that a certain amount of protection will always be available. The value of that coverage will be the same whether the accident is caused by the insured himself or by another driver who carries a lesser amount of liability protection.

*Id.* (quoting in part *Frank v. Horizon Assur. Co.*, Del.Supr., 553 A.2d 1199, 1205 (1989)) (citations omitted).

Based on the foregoing language, it is quite evident that the primary public policy underlying the UM statute is the compensation of innocent Delaware motorists. Viewed in this light, the "mirrored benefits" objective appears to be no more than a means with which to ensure that "a certain amount of protection will be always be available" for compensatory purposes.[5] To

---

**5.** In one sense, it could be argued that the "mirrored benefits" public policy has already been fulfilled in that Murrey's insurance policy has been judicially reformed so that the amount of his UM coverage now "mirrors" the amount of his liability coverage, i.e. $100,000 per person. This argument has considerable force when one contemplates that the entire "mirror" concept appears to be predicated on language in section 3902(b) which states that "[e]very insurer shall offer the insured the option to purchase additional coverage for personal injury or death up to a limit of $100,000 per person and $300,000

per accident or $300,000 single limit, but not to exceed the limits for bodily injury liability set forth in the basic policy." 18 Del.C. § 3902(b). In addition, the Court notes that both *Frank* and *Kenner*, the only Delaware Supreme Court decisions to utilize the mirror concept, involved interpretations of exclusionary language which sought to limit the amount of coverage available under a UM policy, not the quantum of damages. *See Kenner*, 570 A.2d at 1173 (validating underinsurance limiting clause which sought to reduce coverage by amount previously paid by tortfeasor); *Frank*, 553 A.2d at 1204 (striking

**882**

accept Plaintiff's argument that the degree of compensation is somehow irrelevant to this equation promotes form over substance and unnecessarily strains both the language and the purpose of the UM statute. The Court seriously doubts that the Delaware Supreme Court would sanction such a result without some countervailing public policy.

Indeed, the Court believes that the Delaware Supreme Court has already considered and decided the question of how they would deal with the recovery of duplicate expenses in a first-party contractual context. In *State Farm Mut. Auto. Ins. Co. v. Nalbone*, Del.Supr., 569 A.2d 71 (1989), the Delaware Supreme Court declared that:

> the extent to which the collateral source rule should be applied to permit double recovery should depend upon the contractual expectations that underlie the collateral source payment. . . . If the insured has paid consideration for recovery from a collateral source, then recovery should be allowed. If the collateral payments are received gratis, then their receipt should bar recovery under the no-fault policy.

*Id. Accord, Brown v. Nationwide Mut. Ins. Co.*, Del.Supr., 574 A.2d 841 (1990).

While cognizant of the fact that the *Nalbone* decision is based on the relationship of the collateral source rule to Delaware's no-fault statute, the Court finds that the principles announced above are of a much broader scope and thereby constitute the clearest indication of how the Delaware Supreme Court would address the application of the rule in the UM insurance context. First, by focusing on the reasonable contractual expectations of the contracting parties, the *Nalbone* decision avoids the problem of unjust enrichment identified by the *Grissom* court. *See Nalbone*, 569 A.2d at 76 ("No statutory authority is required to deny recovery for losses which did not, in fact, occur or expenses not, in fact, sustained") (quoting *Guy J. Johnson Transp.*

*Co. v. Dunkle*, Del.Supr., 541 A.2d 551, 553 (1988)). Secondly, by rewarding the "risk-adverse insured" who contracts for double recovery, the *Nalbone* decision is consistent with the public policy of encouraging the purchase of insurance for protection against accidents. *See generally*, Note, *California's Collateral Source Rule and Plaintiff's Receipt of Uninsured Motorist Benefits*, 37 Hastings L.J. 667 (1986).

With these principles in mind, a review of the record in this action reveals that the issue of whether the decedent paid consideration for the health insurance plan provided by his employer or merely received it gratis is disputed and thereby constitutes a genuine issue of material fact which precludes the entry of summary judgment. Therefore, Plaintiff's motion for partial summary judgment on the ground that the collateral source rule allows double recovery of decedent's medical bills is denied.

## III. CONCLUSION

Plaintiff's motion for partial summary judgment on the ground that the collateral source rule allows recovery of decedent's medical bills is denied due to a genuine issue of material fact. Plaintiff's other grounds for partial summary judgment are hereby granted.

---

down OMV exclusion clause). *But see Travelers Indem. Co. v. Lake*, Del.Supr., 594 A.2d 38 (1991) (indicating, in dicta, that the mirror concept may have a broader application than the amount of coverage to be made available).