John MITCHELL, Sr., and Donna
Mitchell, Plaintiffs Below,
Appellants,

v.

Dr. Joydeep HALDAR, Defendant
Below, Appellee.

No. 348,2004.

Supreme Court of Delaware.

Submitted: July 20, 2005.
Decided: Aug. 22, 2005.

**34**

Kenneth M. Roseman, Ciconte, Roseman & Wasserman Wilmington, DE, for appellants.

Mason E. Turner, Jr., Prickett, Jones & Elliott, P.A., Wilmington, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND, JACOBS, RIDGELY, Justices and LAMB, Vice Chancellor,[1] constituting the Court en Banc.

HOLLAND, Justice:

This is an appeal by the plaintiffs-appellants, John Mitchell, Sr. and Donna Mitchell, following a jury trial in the Superior Court in an action for alleged medical malpractice against the defendant-appellee, Dr. Joydeep Haldar. The jury returned a verdict in favor of the plaintiffs in the total amount of $15,000. The plaintiffs filed a motion for a new trial, arguing that the damage award was inadequate, because it was substantially less than the medical expenses of $37,997.27. That motion was denied. The plaintiffs have standing to appeal as aggrieved parties, notwithstanding the judgment in their favor, since the relief they received was less than the amount they sought to recover.[2]

Two issues are raised in this direct appeal. The appellants' first contention is that the trial judge misapplied the collateral source rule by excluding evidence of the full amount of Mr. Mitchell's medical bills and instead limiting the evidence of medical expenses to the lesser amounts actually paid by Mr. Mitchell's private health insurance carrier. The appellants' second argument is that they are entitled to a new trial, given the nature of Mr. Mitchell's injuries and the fact that the jury verdict was less than his medical expenses.

### Facts

Mr. Mitchell underwent abdominal surgery for a ruptured appendix. That procedure was performed by Anis Saliba, M.D., a general surgeon at the Beebe Medical Center on the afternoon of July 19, 2001. This litigation concerns the alleged medical negligence of Dr. Haldar, an emergency physician. Dr. Haldar was involved in Mr. Mitchell's evaluation and care during a presentation to the Beebe Medical Center Emergency Department on July 17, 2001. The appellants contend that Mr. Mitchell had appendicitis at the time of that presentation and that Dr. Haldar negligently failed to diagnose it and to arrange for surgery to be performed that evening.

Mr. Mitchell had been sent to the Beebe Emergency Department on July 17, 2001 from another facility to have an abdominal

---

1. Sitting by designation pursuant to Del. Const. art. IV, § 12 and Supr. Ct. R. 2 and 4.

2. *Forney v. Apfel*, 524 U.S. 266, 118 S.Ct. 1984, 141 L.Ed.2d 269 (1998). Generally, a party may not appeal a decision in its favor.

*Electrical Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241, 242, 59 S.Ct. 860, 83 L.Ed. 1263 (1939). *See also Watson, et al. v. City of Newark, et al.*, 746 F.2d 1008 (3d Cir.1984).

CT scan performed to evaluate the cause of his complaint of abdominal pain. Dr. Haldar's first involvement with Mr. Mitchell was after the completion of the CT scan, which was reported back by the radiologist as normal. Dr. Haldar testified that he also performed a physical abdominal examination which was normal. Because of Mr. Mitchell's negative CT scan, reduced pain level and normal abdominal examination, Dr. Haldar testified that he felt the probability of appendicitis or another immediate surgical emergency was very low and that Mr. Mitchell could be discharged with appropriate instructions.

The parties agree that if Dr. Haldar felt Mr. Mitchell had appendicitis on July 17, his course of action would have been to consult a general surgeon, who would have been the individual to make the decision whether Mr. Mitchell required admission and surgery. The record reflects that Dr. Haldar did consult with the on-call surgeon, Dr. James Spellman, and reported to him the diagnostic findings and his tentative conclusion that Mr. Mitchell did not have appendicitis or any other condition constituting a "surgical abdomen." Dr. Spellman testified that it was "very reasonable" to send Mr. Mitchell home with instructions and he felt no reason to countermand Dr. Haldar's decision.

The discharge instructions given to Mr. Mitchell by Dr. Haldar on July 17 advised Mr. Mitchell that his condition could be consistent with "a serious problem requiring surgery (such as appendicitis) or something innocent which would resolve on its own." Those discharge instructions also advised Mr. Mitchell of things to watch for including: more severe pain; persistent vomiting; shaking, chills or fever; and failure to improve. Mr. Mitchell was instructed that if any or all of these conditions became manifest within the next 24 hours, he should seek immediate medical attention.

The record reflects that on July 18, the day after he left the Emergency Department, Mr. Mitchell developed persistent vomiting, chills and fever, increased pain and failed to improve. Nevertheless, Mr. Mitchell did not return to the Emergency Department or see a doctor on July 18. When Mr. Mitchell sought medical assistance on July 19, his appendix was found to be ruptured. The record reflects that Mr. Mitchell's appendix was not ruptured on July 17.

The appellants' theory of medical negligence was that since in retrospect it is known that Mr. Mitchell had an early appendicitis at the time of his July 17, 2001 presentation at the Beebe Medical Center Emergency Department and since the symptoms which he had at that time were consistent with "classic" appendicitis, Dr. Haldar was negligent in failing to diagnose appendicitis, in relying upon the negative CT scan and must have either failed to perform the physical abdominal examination to which he testified or did it inadequately.[3] At trial, the plaintiffs pointed out that the abdominal CT scan did not "rule out" the presence of appendicitis with absolute certainty and the report of the CT Scan did not even mention the appendix.

Mr. Mitchell testified regarding a variety of physical problems which he contended he did not have prior to July 17, 2001 and that, therefore, must be related to the *delay* in diagnosis of appendicitis. These problems included ongoing abdominal pain, a pulmonary embolism which developed in

3. In fact, Mr. Mitchell testified that Dr. Haldar did not perform an abdominal examination.

September, 2001, which Mr. Mitchell claimed caused ongoing respiratory problems and a hernia which was repaired in February, 2004. Mr. Mitchell also testified he could no longer work because of the multitude of problems which he attributed to the delay in diagnosis caused by Dr. Haldar.

The appellants presented no evidence from any of Mr. Mitchell's treating physicians. Instead, the evidence which the appellants presented to causally connect Mr. Mitchell's complaints to Dr. Haldar's alleged medical negligence was expert testimony by Stephen Rodgers, M.D., a physician lawyer, who conducted a medical examination of Mr. Mitchell in November, 2003 for purposes of this litigation. Dr. Rodgers testified that Mr. Mitchell sustained four distinct injuries due to Dr. Haldar's negligence in failing to diagnose and treat appendicitis before the appendix perforated. Those four injuries were: the development of an infection and the resultant reaction to antibiotics prescribed to treat the infection; the development of a pulmonary embolism and the resultant susceptibility to embolisms in the future; the development of an incisional hernia; and the development of adhesions in the abdominal cavity. Dr. Rodgers also testified that Mr. Mitchell was either hospitalized or treated on four separate occasions to address the four distinct injuries that he opined were caused by the medical negligence of Dr. Haldar.

On cross-examination, Dr. Rodgers acknowledged that Mr. Mitchell would have required an abdominal incision if his appendicitis had been diagnosed by Dr. Haldar on July 17 and that any incision can lead to adhesions. Accordingly, Dr. Rodgers also acknowledged that if the appendectomy had been performed when the appellants claimed it should have been, Mr. Mitchell still could have developed adhesions and the incisional hernia. On cross-examination, Dr. Rodgers also acknowledged that the slightly elevated respiratory rate was consistent with Mr. Mitchell's age and history of smoking for more than thirty years which had led him in July, 2003 to be diagnosed by his pulmonologist with emphysema.

Dr. Rodgers testified that Mr. Mitchell had applied for Social Security disability based on four claimed medical conditions: cardiac problems; low back problems; knee problems; and breathing problems. On cross-examination, Dr. Rodgers acknowledged that the first three medical conditions had no relationship to Mr. Mitchell's appendicitis. With regard to Mr. Mitchell's breathing problems, Dr. Rodgers acknowledged that Mr. Mitchell had underlying pulmonary disease, as diagnosed by his pulmonologist, most probably related to his long history of smoking. Dr. Rodgers did not attempt to quantify any distinction between the breathing problems related to the underlying pulmonary disease and the pulmonary embolism that he attributed to Dr. Haldar's negligence.

The only witness to testify regarding the injuries caused to Mr. Mitchell by Dr. Haldar's alleged medical negligence was the appellants' medical expert, Dr. Stephen Rodgers. Dr. Haldar did not present any expert testimony regarding the issue of causation. Instead, Dr. Haldar relied upon the cross-examination of Dr. Rodgers to undermine the force and effect of Dr. Rodgers' direct testimony. On redirect examination, Dr. Rodgers adhered to his original opinions regarding Dr. Haldar's negligence and its causal connection to Mr. Mitchell's medical problems.

The appellants sought to recover the expenses associated with all of the medical treatment that Mr. Mitchell received from July 17, 2001 to the time of trial. This

included visits with his family doctor, treatments with his pulmonologist for emphysema which was diagnosed on July, 2003, cardiology consultations, and the February, 2004 hernia surgery. The appellants proffered copies of medical bills to prove that the total reasonable cost of Mr. Mitchell's necessary medical treatment was $58,997.27. The trial judge, however, ruled that the appellants could recover only those expenses that were actually paid by Mr. Mitchell's private insurance carrier, Blue Cross, as opposed to those amounts that were billed by Mr. Mitchell's health care providers. After that evidentiary ruling, the parties stipulated that the total medical expenses actually paid by Mr. Mitchell's private insurance coverage with Blue Cross were $37,997.27.

The jury concluded that Dr. Haldar was negligent. The jury awarded damages to Mr. Mitchell in the amount of $13,000.00. The jury awarded $2,000.00 in damages to his wife for loss of consortium. The appellants moved for a new trial on the grounds that the jury's verdicts were inadequate, especially since the total award of damages was less than one-third of their evidence of Mr. Mitchell's medical expenses. The trial judge denied that motion.

### Collateral Source Rule

■ When it is alleged that a tortfeasor is responsible for medical services, the plaintiff bears the burden of proof on two distinct issues. First, the plaintiff must demonstrate that value claimed for those medical services was reasonable. Second, the plaintiff must establish that the need for those medical services was proximately caused by the negligence of the alleged tortfeasor.

Prior to trial, the plaintiffs proffered an exhibit of bills from health care providers which itemized Mr. Mitchell's medical expenses and totaled $58,997.27. Dr. Haldar objected to the admission of the medical bills on the grounds that the plaintiffs could only recover the expenses actually paid by his private health care insurer and not the total amounts billed by the health care providers.

The trial judge sustained Dr. Haldar's objection. Thereafter, the parties entered into a stipulation to submit a revised exhibit which contained a listing of the health care providers' services without any itemization of the actual individual costs that were paid by Blue Cross and a total in the amount of $37,997.27.

The appellant's contend that the trial judge's evidentiary decision to exclude the full amount of Mr. Mitchell's medical bills was erroneous because it violated the collateral source rule. The first application of the collateral source rule in American jurisprudence was apparently more than one hundred and fifty years ago in a case ultimately decided by the United States Supreme Court.[4] Although its operation had raised questions for over a century,[5] more than four decades ago, the collateral source rule was recognized by this Court as already "firmly embedded" in Delaware law.[6]

■ The collateral source rule is "predicated on the theory that a tortfeasor has no interest in, and therefore no right to benefit from monies received by the

---

4. *The Propeller Monticello v. Mollison*, 58 U.S. 152, 17 How. 152, 15 L.Ed. 68 (1854). *See* Maxwell, *The Collateral Source Rule in the American Law of Damages*, 46 Minn.L.Rev. 669, 670–71 (1962).

5. Note, *Unreason in the Law of Damages: The Collateral Source Rule*, 77 Harvard L.Rev. 741, 742–43 (1964).

6. *Yarrington v. Thornburg*, 205 A.2d 1 (Del. 1964).

injured person from sources unconnected with the defendant."[7] According to the collateral source rule, "a tortfeasor has no right to any mitigation of damages because of payments or compensation received by the injured person from an independent source."[8] The rationale for the collateral source rule is based upon the quasi-punitive nature of tort law liability. It has been explained as follows:

> The collateral source rule is designed to strike a balance between two competing principles of tort law: (1) a plaintiff is entitled to compensation sufficient to make him whole, but no more; and (2) a defendant is liable for all damages that proximately result from his wrong. A plaintiff who receives a double recovery for a single tort enjoys a windfall; a defendant who escapes, in whole or in part, liability for his wrong enjoys a windfall. Because the law must sanction one windfall and deny the other, it favors the victim of the wrong rather than the wrongdoer.[9]

Thus, the tortfeasor is required to bear the cost for the full value of his or her negligent conduct even if it results in a windfall for the innocent plaintiff.[10]

Under the collateral source rule, a plaintiff may recover damages from a tortfeasor for the reasonable value of medical services, even if the plaintiff has received complete recompense for those services from a source other than the tortfeasor. The collateral source rule requires the injured party to be made whole exclusively by the tortfeasor and not by a combination of compensation from the tortfeasor and collateral sources.[11] The benefit conferred on the injured person from the collateral source is not credited against the tortfeasor's liability, even if the plaintiff has received partial or even complete value.[12] Thus, under the collateral source rule, a plaintiff could recover from a tortfeasor for the reasonable value of medical services provided even if those services were provided gratuitously.[13]

The vast majority of courts have held that the collateral source rule prohibits the tortfeasor from reaping the benefit of a health insurance contract for which the tortfeasor paid no compensation.[14] Therefore, when an injured person has insurance which pays for the cost of treatment and hospitalization, in whole or in part, those payments inure to the benefit of the insured rather than the tortfeasor.[15] Accordingly, the general rule is that the plaintiff's damages may not be reduced because of payments for treatment paid for by medical insurance to which the tortfeasor did not contribute.[16] Conversely, this Court and other courts have recognized that there is "no reason why a risk

---

7. *State Farm Mut. Auto. Ins. Co. v. Nalbone,* 569 A.2d 71, 73 (Del.1989).

8. *Id.*

9. *Acuar v. Letourneau,* 260 Va. 180, 531 S.E.2d 316, 323 (2000) (quoting *Schickling v. Aspinall,* 235 Va. 472, 369 S.E.2d 172, 174 (1988)).

10. *Id.*

11. *Acuar v. Letourneau,* 260 Va. 180, 531 S.E.2d 316, 323 (2000).

12. Restatement (Second) of Torts § 920A.

13. *Hueper v. Goodrich,* 314 N.W.2d 828 (Minn.1982).

14. *See Yarrington v. Thornburg,* 205 A.2d 1 (Del.1964).

15. *See Collateral Source Rule: Injured Person's Hospitalization or Medical Insurance as Affecting Damages Recoverable,* 77 A.L.R.3d 415.

16. *State Farm Mut. Auto. Ins. Co. v. Nalbone,* 569 A.2d 71 (Del.1989).

adverse insured may not contract for a double recovery." [17]

In this case, Dr. Haldar acknowledges that the collateral source rule applies and permits Mr. Mitchell to recover the actual payments made by Mr. Mitchell's private health insurance carrier. Dr. Haldar contends, however, that the Superior Court correctly ruled Mr. Mitchell could not recover the full amounts of his medical bills unless those amounts were actually paid by Blue Cross. Dr. Haldar's argument reflects a fundamental misunderstanding of the proper application of the collateral source rule to a tortfeasor's responsibility to pay the full reasonable value of the necessary medical treatment caused by the negligent conduct.

▮ The collateral source rule provides that "it is the tortfeasor's responsibility to compensate for the reasonable value of all harm that he [or she] causes [and that responsibility] is *not* confined to the net loss that the injured party receives." [18] That cardinal principle of the collateral source rule was recently addressed by this Court in *Onusko v. Kerr*, [19] which involved an allegation that negligent driving caused an automobile collision. In that case, the normal charge for each physical therapy treatment was $534. "Because Mr. Kerr did not have health insurance, however, [the physical therapist] wrote off a portion of those bills and accepted a cash payment of $282 per visit." This Court held that a proper application of the collateral source rule entitled Mr. Kerr to compensation for the reasonable value of the medical services necessitated by the tortfeasor's negli-

gence and "the evidence of that *value* was the *billed* price of $534 per visit." [20]

Although this case was tried before our recent decision in *Onusko v. Kerr*, the trial judge acknowledged that a proper application of the collateral source rule would have allowed Mr. Mitchell to introduce the full amounts of his medical bills in an automobile accident case. The trial judge stated that she would have applied the collateral source rule "in the context of a defendant who's in a car accident" but not in a medical malpractice case because "to me it is just an extension of the collateral source rule that I'm not willing to invoke in this context, not in the context of the medical malpractice case." That ruling is contrary to the express recognition by the General Assembly of the general collateral source rule, when the Delaware Medical Malpractice statute was enacted twenty-five years ago.

▮ The Delaware Medical Malpractice Act provides a very limited statutory modification to the general operation of the collateral source rule.

§ 6862. **Collateral source.**

In any medical negligence action for damages because of property damage or bodily injury, including death resulting therefrom, there may be introduced, and if introduced, the trier of facts shall consider evidence of: (1) Any and all facts available as to any *public collateral source* of compensation or benefits payable to the person seeking such damages (including all sums which will probably be paid payable to such person in the future) on account of such property

---

**17.** *Id.* at 75.

**18.** Restatement (Second) of Torts § 920A cmt. b (1977).

**19.** 880 A.2d 1022, 1023 (Del.2005).

**20.** L.C. Di Stasi, Jr., Annotation, *Necessity and Sufficiency, in Personal Injury or Death Action, of Evidence as to Reasonableness of Amount Charged or Paid for Accrued Medical, Nursing, or Hospital Expenses*, 12 A.L.R.3d 1347 (2004) (emphasis added).

damage or bodily injury; and (2) any and all changes, including prospective changes, in the marital, financial or other status of any persons seeking or benefiting from such damages known to the parties at the time of trial; provided, however, *this section shall not be applicable* to life insurance or *private collateral sources* of compensation or benefits.[21]

Twenty years ago, this Court held that the limited "purpose of this statute is to prevent the collection of a loss from a collateral *public* source (such as Social Security) and then for the same loss from the party or hospital being sued."[22]

That statutory purpose is not implicated here, because the source of the collateral benefit was private, not public. In this case, each of Mr. Mitchell's health care providers contracted to accept reduced payments from his *private* medical insurance carrier, Blue Cross, as payment in full. As we recently held in *Onusko v. Kerr*, the portions of medical expenses that health care providers write off constitute "compensation or indemnity received by a tort victim from a source collateral to the tortfeasor."[23] The result is the same whether the write off is generated by a cash payment such as Kerr's or, as in this case, because of a reduction attributable to a health insurance contract for which the tortfeasor paid no compensation.[24] Consequently, Mr. Mitchell was entitled to present evidence of the full amount of his

medical expenses without any reduction for the amounts written off by his health care providers because of their contracts with Mr. Mitchell's health insurance carrier, Blue Cross.[25]

We hold that the trial judge erred by excluding the full amount of the medical bills as evidence of the total amount of Mr. Mitchell's reasonable medical expenses. The trial judge's decision was contrary to Delaware's well-established common law recognition of the collateral source rule and, in the context of this case, was not governed by the rule's limited statutory modification in the Delaware Malpractice Act.[26] The trial judge's evidentiary ruling erroneously reduced the appellants' damage claim for medical treatment by $20,000 to approximately $38,000 instead of approximately $58,000.

Where an appeal is based upon a claim that the trial judge erroneously excluded evidence, the reviewing court must first decide whether the specific ruling was correct. If the reviewing court finds error, it must then determine if the mistake constituted such prejudice as to have denied the appellant a fair trial.[27] We conclude, for the reasons stated in addressing the appellants' next argument, that the trial judge's evidentiary ruling did not adversely affect the jury's verdict. Accordingly, we turn to the appellants' second argument.

---

21. Del.Code Ann. tit. 18, § 6862.

22. *Nanticoke Hospital v. Uhde*, 498 A.2d 1071, 1075 (1985).

23. *Acuar v. Letourneau*, 260 Va. 180, 531 S.E.2d 316 (2000) (quoting *Schickling v. Aspinall*, 235 Va. 472, 369 S.E.2d 172, 174 (1988)).

24. *See Yarrington v. Thornburg*, 205 A.2d 1 (Del.1964).

25. *Id.*

26. We note that the issue of whether any of the reductions in Mr. Mitchell's medical bills qualified as a "public collateral source" was not raised at trial or on appeal.

27. *Strauss v. Biggs*, 525 A.2d 992 (Del.1987).

### New Trial Properly Denied

After four days of trial, the jury returned a verdict in favor of the appellants and awarded a total of $15,000 in damages. Of that amount, $2,000 was designated for Donna Mitchell, for loss of consortium. In their motion for a new trial, the appellants argued that the damages' award was inadequate because it was substantially less than the medical expenses of $37,997.27. According to the appellants, Dr. Haldar presented no evidence to support a conclusion that the medical treatments incurred by Mr. Mitchell were not caused by Dr. Haldar's negligence nor any evidence that the medical expenses presented were not reasonable or necessary.

In response to the request for a new trial, Dr. Haldar submitted that plaintiffs' proof of damages was "far from compelling." According to Dr. Haldar, regardless of anything done by him, Mr. Mitchell would had to have undergone abdominal surgery, have been hospitalized, and had an incision. Dr. Haldar also challenged the appellants evidence, connecting Mr. Mitchell's pulmonary embolism and hernia surgery to Dr. Haldar's negligence, reasoning that these problems could have occurred in any case. Dr. Haldar contends that the appellants' attempt to link Mr. Mitchell's ongoing abdominal problems to the delay in surgery were refuted by the medical records of his treating surgeon, Dr. Saliba. Dr. Haldar also submits that Mr. Mitchell's claim of ongoing effects of the pulmonary embolism was also refuted by the records of his treating pulmonologist, Dr. Salvatore, who discharged him for his care in April 2002.

The trial judge denied the motion for a new trial. Although the total jury award to Mr. Mitchell was less than one-third of the medical damages submitted by the plaintiffs, the trial judge stated that her conscience was "not shocked by the jury's verdict in this case, and does not find the award inappropriate under the circumstances." In denying the new trial motion, the trial judge identified several explanations for why the jury's verdict was less than the medical expenses. The trial judge stated that any one of the following explanations or a combination of them, supported her conclusion that the jury verdict should not be disturbed:

In the first place, contrary to plaintiffs' repeated assertions that the medical evidence was "uncontradicted" as to damages, it was not. In fact, plaintiffs' proof of damages was far from convincing. What *is* undisputed is that, regardless of anything done, or not done, by Dr. Haldar, plaintiff would have had to have undergone abdominal surgery, and been hospitalized, as that course of treatment is absolutely necessary in the case of appendicitis. Experts for both plaintiffs and defendant's testified that surgical intervention would have been required in either case. The jury could have concluded that plaintiff would have endured pain and suffering from the appendicitis no matter when it was diagnosed. And, while there was some testimony that the surgical procedure may have been less invasive had the diagnosis been made prior to the rupture, there was no evidence as to what would have happened in the interim if plaintiffs' liability theory was correct, or what the consequences would have been.

In this case, plaintiffs' theory of the case simply assumed that, had the defendant acted as plaintiffs contended he should have, the appendix perforation and all the other alleged complications and consequences would have been avoided. Yet, the jury could have (and apparently did) allocate the amount of damages based not on what plaintiff ac-

tually claimed, but on an effort to assess the additional damages attributable to the ruptured, as opposed to an unruptured, appendix. Or, the jury may well have believed that none of the medical expenses were compensable, with the resulting award representing the jury's view of the amount necessary to indemnify plaintiffs for pain and suffering only.

Similarly, when plaintiff developed a pulmonary embolism several months after the surgery, plaintiffs' contention was that this complication was related to the delayed diagnosis of appendicitis, allegedly resulting in more extensive surgery and longer immobilization. Evidence was also presented to the jury, however, that in February 2004, plaintiff had minor surgery involving no incision and no inpatient hospitalization. Yet, plaintiff developed the same problem following that procedure. And, while plaintiff sought to link his February 2004 surgery for an incisional hernia to defendant's negligent delay in diagnosis of the appendicitis, the jury also learned that the more compelling reason for the plaintiffs' 2004 surgery was his umbilical hernia, unrelated to the appendectomy. What is more, evidence at trial showed that the incisional hernia was a complication that could have occurred in the case of any abdominal incision, regardless of Dr. Haldar's actions or inactions.

Moreover, plaintiff's contention that his ongoing abdominal problems were the result of Dr. Haldar's negligence, was largely refuted by the records of Dr. Saliba, his treating surgeon....

Furthermore, plaintiff argues that the expert medical testimony was "unrebutted," "proving that the medical expenses were proximately caused by the defendant's negligence." The fact that plaintiff presented an "expert" who opined as such does not mean that the jury was required to accept his testimony as true, especially in a case such as this. The jury was instructed that they could give expert testimony the weight it deserved and that, just like any other witness, an expert's opinion could be disregarded by the jury if they concluded that it was unreasonable or not supported by the evidence.

Indeed, the plaintiffs' choice of Dr. Stephen Rodgers as his expert on causation, to support these alleged complications, and to link them to Dr. Haldar's negligence, could have led the jury to question seriously the validity of these damages. Dr. Rodgers' expertise in offering broad-based causation theories may have been rejected by the jury for several reasons ....

The jury's possible distrust of that opinion, coupled with the obvious connection between plaintiff's smoking and his lung disease and emphysema, provide ample justification for the jury's verdict in an amount that was less than the medical expenses.

The amount of damages attributable to defendant doctor's missed appendicitis diagnosis was also a matter of great conflict in this case. As demonstrated, the evidence provided a clear and rational basis for the jury to discount many elements of claimed damages and to determine not to award them. In a case like this, the fact that the verdict was less than the claimed 'outstanding medical bills' does not require a new trial, as plaintiffs contend. The entries on plaintiff's exhibit 10 contain no explanation or itemization, making it difficult to determine exact amounts for each provider, and the exhibits include some medical providers who could easily have been eliminated by the jury consistent with the evidence.

For example, the jury could well have concluded that all expenses after the initial hospitalization in July of 2001 were not the result of defendant's negligence, or that the bulk of the expenses would have been incurred, even in the absence of Dr. Haldar's negligence, or even that certain types of expenses had nothing to do with his appendicitis. The fact that the jury was forced to speculate regarding which portion of the medical expenses were attributable to Dr. Haldar's negligence, in the face of a non-specific, non-itemized, and non-documented exhibit listing those expenses, should not now be a basis for plaintiffs to claim that "the jury's failure to award those expenses must have been the result of improper speculation and conjecture." Having failed to provide a complete itemization and specific individualized listing of what each physician charged, and which expenses were related to each hospitalization, plaintiffs cannot now complain that the jury's verdict was based upon improper speculation and conjecture.

In this case, the jury was persuaded by the plaintiffs' evidence of liability and concluded that Dr. Haldar was negligent. Nevertheless, the jury did not accept the plaintiffs' contention as to damages, *i.e.,* that all of Mr. Mitchell's medical problems following the appendectomy were proximately caused by Dr. Haldar's negligence. The United States Supreme Court has characterized "vigorous cross-examination" as one of the "traditional and appropriate means of attacking shaky but admissible evidence."[28] The record reflects that the evidence developed during the cross-examination of the appellants' expert, Dr. Rodgers "called into question the reliability of that expert's opinion as to causation."[29]

■■■ This Court reviews a trial court's denial of a motion for a new trial for abuse of discretion.[30] A jury verdict is presumed to be correct[31] and "will be upheld unless it is against the 'great weight of the evidence.'"[32] The Delaware Constitution sets forth this Court's standard of review: "on appeal from a verdict of a jury, the finding of the jury, if supported by the evidence, shall be conclusive."[33]

When the trial judge ruled that only the actual amounts paid for Mr. Mitchell's medical treatment could be admitted into evidence, the appellants could have crafted an exhibit that itemized each of the medical services provided and the amount of each payment. In fact, most of the Blue Cross "statements of benefits" had already been provided to Dr. Haldar's attorney. Obviously, sufficient information was available to support the stipulation that the total amount paid for Mr. Mitchell's medical treatments was $37,997.27.

Instead of an itemization, however, the appellants decided to present the jury with a lump sum for the total costs of Mr. Mitchell's medical treatments. This was consistent with the appellants' contention that all of the medical problems sustained by Mr. Mitchell following the appendectomy were proximately caused by Dr. Haldar's negligence. Clearly, the appellants

**28.** *Daubert v. Merrell Dow,* 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**29.** *Dunn v. Riley,* 864 A.2d 905; 907 (Del. 2004).

**30.** *Storey v. Camper,* 401 A.2d 458, 465 (Del. 1979).

**31.** *Lacey v. Beck,* 161 A.2d 579 (Del.Super.1960).

**32.** *Walker v. Shoprite Supermarkets, Inc.,* 859 A.2d 620, 622 (Del.2004). *Dunn v. Riley,* 864 A.2d 905 (Del.2004).

**33.** Del. Const. art. IV, § 11(1)(a).

wanted the total amount of Mr. Mitchell's medical expenses to be the starting point for the jury's verdict. Although it did not succeed, that was an eminently reasonable trial strategy.

The expenses for each of the medical services incurred by Mr. Mitchell were admissible evidence based upon the testimony of the appellants' expert, Dr. Rodgers. Whether the need for each of those medical services was proximately caused by Dr. Haldar's negligence, however, was a factual determination for the jury to make. The jury's verdict reflects a conclusion that, at most, only a small portion of Mr. Mitchell's subsequent medical treatment was proximately caused by Dr. Haldar's negligence.

The trial judge properly concluded that the jury's verdict was supported by the evidence. The appellant has not shown that the jury's decision to award Mr. Mitchell damages in an amount that was approximately one-third of the $38,000 in medical expenses introduced at trial would have changed if his medical bills in the entire amount of $58,000 had properly been admitted into evidence. Accordingly, given the record before the trial court, we find no abuse of discretion in its denial of the appellants' motion for a new trial.

### Conclusion

The judgments of the Superior Court are affirmed.