STRINE, Chief Justice,
concurring:
I join the excellent opinion of the Court, and write separately only to note that this decision illustrates the wisdom of taking a Hippocratic approach to applying longstanding doctrines that have been extended beyond what was necessary to accomplish their original goal. In other words, by taking a “this far, no further” approach to the collateral source rule, the Court adheres to the principle, “first do no harm.”
The Court respects the reality that Harbor Healthcare has not asked us to narrow the reach of the collateral source rule, but only to refuse to extend it to this context. But the case before us calls into question the wisdom of applying the collateral source rule — itself an exception to the general rule of damages that a plaintiff is entitled to be made whole and nothing more[53] — in its current form, in an era *535 where we are closer to achieving universal healthcare, and where rising healthcare costs are reducing access to care and harming our nation’s economic health. For these reasons, other courts have restricted and even eliminated the collateral source rule.[54] In both a situation like the current case involving Medicare write-offs, and also a related situation where a hospital or other provider voluntarily gives free or discounted medical care, any recovery from the tortfeasor on the theory that the provider accepted less than the reasonable value of the plaintiffs medical services should go to that provider, and not to the plaintiff who did not pay any out-of-pocket costs, and only if the provider itself desires to recover the supposed shortfall.
As the Court notes, the collateral source rule emerged to “balance between two competing principles of tort law: (1) a plaintiff is entitled to compensation sufficient to make him whole, but no more; and (2) a defendant is liable for all damages that proximately result from his wrong.”[55] Thus, when properly applied, the rule ensures that the party whose negligence caused the injury bears all of the resulting costs, which provides a useful financial incentive for the exercise of due care by defendants like Harbor Healthcare.[56] It is especially important to put the cost of care for preventable medical injuries on the tortfeasor, not because of a desire to be generous to health insurers, even governmental ones. The reason is that when health insurers bear excess costs because they must pay the costs of care resulting from preventable injuries, they will charge higher rates, increasing societal healthcare costs, and potentially inhibiting the receipt of necessary care by the economically vulnerable.
Historically, courts have applied the collateral source rule to allow a plaintiff to *536 recover the full cost of her medical bill from the tortfeasor even when her insurance company paid for all or a portion of it.[57] In such cases, subrogation rights have often operated to eliminate any “double recovery” for the plaintiff, and thus avoided the problem of short-changing the insurer.
In this case, by contrast, if we were to apply the collateral source rule to allow Stayton to recover the full amount of her medical bill, it would not help the real party that Stayton contends was shortchanged: Crozer Burn Center. Stayton’s lawyer is not acting as the champion of a hospital that he alleges did not receive fair reimbursement for providing critical care to his client, but is instead seeking to have his client pocket compensation for hospital charges that she was never obligated to pay, charges that are thirteen times greater than the amount that Medicare actually paid on his client’s behalf. Likewise, if the collateral source rule was employed to allow a plaintiff such as Stayton to recover the full cost nf medical treatment she received for free, rather than requiring her recovery to go to the hospital, the rule would perversely provide a windfall for the plaintiff, rather than fairly allocate an award of expenses to the party that actually incurred them.
It makes sense not only as a matter of good incentives, but of fundamental fairness, to ensure that a provider that gives charitable or discounted care to help a tort victim who cannot pay for the care is able to be topped up to market when the tort-feasor is held accountable for the tort. But why the plaintiff should get to pocket the difference for herself as part of her recovery, leaving the provider who did the good deed with a shortfall, measured precisely by the extent of the plaintiffs own windfall, is harder to understand.[58] That seems a poor repayment to the provider for its charity.
Of course, the common law might determine that a plaintiff who acts as an enforcement agent for herself and her healthcare provider should receive an award of attorneys’ fees and costs to ensure that the net recovery of her healthcare costs is not reduced by any enforcement costs. Even under that approach, windfalls should be avoided, and there should be no double recovery of enforcement costs or any incentives created to run them up.[59] In considering issues like this, *537 it must be remembered that plaintiffs like Stayton may also bring claims for non-economic damages, such as damages for pain and suffering, and for economic damages unrelated to healthcare costs, such as lost income.[60] But permitting a plaintiff to recover more than her financial loss as damages for theoretical expenses that she or her insurer will never be obligated to pay serves no useful purpose* and instead creates rents for lawyers, raises costs for employers in the form of higher liability insurance premiums, and bestows windfalls on certain plaintiffs, not for rational reasons, but for happenstance.
Allowing a plaintiff like Stayton to recover the full value of the hospital services Crozer provided at a supposed discount would also do nothing to reduce the corresponding harm to social welfare that results from Crozer’s increased costs, incurred because of Harbor Health’s alleged negligence. When a hospital has to treat additional patients because a tortfeasor failed to exercise due care, its capacity to treat other patients becomes more limited. If the hospital also generously discounts the cost of the services it provides because, for example, the patient was uninsured and unable to pay the full cost of treatment, it will incur even greater costs. Ensuring that any tort recovery for the reasonable cost of treatment goes to the hospital that provided the medical care at a lower-than-market rate ameliorates the overall loss to social welfare due to the tortfeasor’s negligence. Moreover, requiring the tortfeasor to bear the full cost of the harm imposed on the victim, the victim’s insurer, and the victim’s healthcare providers, and no more, sets the right incentive for deterrence.[61]
Because the Court’s well-reasoned opinion is directionally sensitive to these concerns, I gladly join it in full.

. See 25 CJ.S. Damages § 189 (2015) (“The collateral-source rule is an exception to the general rule of damages preventing a double recovery by an injured party, or in other words, it is an exception to the general rule that in a tort action, the measure of damages *535 is that that will compensate and make the plaintiff whole.”).

. E.g., Bryce Benjet, A Review of State Law Modifying the Collateral Source Rule: Seeking Greater Fairness in Economic Damages Awards, 76 Def. Couns. J. 210 (2009) (noting that "although the [collateral source] rule is entrenched in the common law, there is a growing trend to restrict, if not abolish, the rule,” and citing cases); Gary T. Schwartz, A National Elealth Care Program: What Its Effect Would Be on American Tort Law and Malpractice Law, 79 Cornell L. Rev. 1339, 1341 (1994) (“[T]he collateral source rule has by now been abolished in several states.”); Michael K. Beard, The Impact of Changes in Health Care Provider Reimbursement Systems on the Recovery of Damages for Medical Expenses in Personal Injury Suits, 21 Am. J. Trial Advoc. 453, 476-77 (1998) ("The collateral source rule and its policy justifications were widely accepted before health insurance became prevalent. Therefore, it was foreordained that the rule would be applied to, all forms of health insurance.... Only with the tort reform legislation of the last twenty years has there been any substantial modifications to the rule ... ”); 3 Litigating Tort Cases § 30:5 ("Several states have abolished or modified the collateral source rule in medical malpractice cases.”); cf John G. Fleming, The Collateral Source Rule and Loss Allocation in Tort Law, 54 Calif. L. Rev. 1478, 1478-82 (1966) (noting that the rationale for the collateral source rule when adopted — shifting losses to more affluent parties — has become less compelling in a society that prioritizes social programs over tort recovery as a mechanism for loss shifting); Rebecca Levenson, Comment, Allocating the Costs of Harm to Where They Are Due: Modifying the Collateral Source Rule After Healthcare Reform, 160 U. Pa. L. Rev. 921 (2012) (arguing that the collateral source rule should be limited in the wake of the individual mandate under the Affordable Care Act).

. Mitchell v. Haldar, 883 A.2d 32, 38 (Del.2005).

. See 25 C.J.S. Damages § 189 (2015) ("The collateral-source rule, like other tort principles, also aims át deterring a tortfeasor’s negligent conduct, and accordingly, it makes the tortfeasor fully responsible for damages caused as a result of tortious conduct.”).

. See, e.g., Mitchell, 883 A.2d at 38.

. In Onusko v. Kerr, for example, a physical therapist lowered his rates for an uninsured patient who_ was injured in a motorcycle crash. The patient was then allowed to recover the full market rate from the tortfeasor under the collateral source rule, with no apparent obligation to make the physical therapist whole for the amount that he should have received. See Onusko v. Kerr, 880 A.2d 1022, 1024-25 (Del.2005) (quoting the Restatement (Second) of Torts § 920A(2) and comment c.(3) for the proposition that ''[pjayments made to or benefits conferred on the injured party from other sources, are not-credited against the tortfeasor’s liability, although they cover all or part of the harm for which the tortfeasor is liable.... This applies to cash gratuities and to the rendering of services. Thus the fact that the doctor did not charge for his services ... does not prevent [the plaintiff’s] recovery for the reasonable value of the services.”).

. The rare case where a double recovery should be permitted is where an insured person has contracted for it specifically. In that case, the plaintiff does not really receive a double recovery because the insured party has contracted and paid for the right to recover. Those of us who went to school some decades ago might recall that students were often offered the chance to buy policies that provided for certain payments if a body part suffered specified damage for any reason (for example, $10,000 in the event of a loss of a pinkie). If a parent bought two separate policies of that kind for their child-student, and the student lost a pinkie, both policies would have to pay. *537 That would not involve a double recovery; it would be the exact recovery that the insured party had paid for. See, e.g., Helfend v. S. Cal. Rapid Transit Dist., 2 Cal.3d 1, 84 Cal.Rptr. 173, 465 P.2d 61, 66 (1970) (noting that applying the collateral source rule ensures "that a person who has invested years of insurance premiums to assure his medical care ... receives the benefits of his thrift").

. See 3 Stein on Personal Injury Damages Treatise § 22:7 (3d ed.).

. See, e.g., A. Mitchell Polinsky, Steven Sha-vell, Punitive Damages: An Economic Analysis, 111 Harv. L. Rev. 869 (1998) ("The central point that we want to explain here is that, if a defendant will definitely be found liable for the harm for which he is responsible, the proper magnitude of damages is equal to the harm the defendant has caused. If damages are either lower or higher than the harm, various socially undesirable consequences will result.... ”).