# IN THE COURT OF COMMON PLEAS
## FOR THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

CORRINA FORAKER,

       Plaintiff,

       v.

JENNIFER RIFE and
DAVE RIFE,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

**C.A. No. CPU4-15-002214**

## <u>MEMORANDUM OPINION & ORDER</u>

Submitted: March 15, 2017
Decided: April 3, 2017

Brian S. Legum, Esq.
Kimmel, Carter, Roman, Peltz & O'Neill, P.A.
56 West Main Street, Plaza 273, 4th Fl.
Newark, DE 19702
*Attorneys for Plaintiff*

Jennifer Rife, &
Dave Rife
105 Willow Tree Lane
Newark, DE 19702
*Pro se Defendants*

**WELCH, J.**

This case concerns a dog bite that resulted in personal injury to the Plaintiff. Both parties appeared for trial before the Court on March 15, 2017. The Court reserved its decision. This is the Court's Final Memorandum Opinion and Order after consideration of the pleadings, oral and documentary evidence submitted at trial, arguments made at trial, and the applicable law.

The Court notes, preliminarily, that it is sympathetic to Defendants Jennifer and Dave Rife, as strict liability prevents, except for the statutory exception, which is not applicable there, the Court from considering Defendants' responsible ownership and control of their dog. Nevertheless, as the Court is bound by the controlling statute, the Court enters judgment in favor of Plaintiff Corrina Foraker in the amount of $5,821.87 plus costs for the following reasons.

## I. Facts

Based on the testimony and evidence presented at trial, the Court finds the relevant facts to be as follows.

On May 31, 2014, Defendants' senior Rottweiler, Daisy, bit Plaintiff's left hand when Plaintiff attempted to pet Daisy after arriving at Defendants' property to pick up her daughter.[1] Plaintiff and Defendants live in the same neighborhood, approximately ten minutes from each other. For several months prior to this incident, Plaintiff's daughter, Hailey Foraker, and Defendants' daughter, Rebecca

---

[1] Plaintiff is an adult female in her early forties. *See* Plaintiff's Exhibit 1; Defendants' Exhibit 3.

Rife, were friends and spent significant time at each other's homes.[2]   Hailey testified that she had been to "Becca's" home "too many times to count." Normally, Plaintiff would call Hailey to notify her that Plaintiff was leaving and walking to Defendants' home to take Hailey home.  When Plaintiff arrived, Plaintiff often interacted with Daisy and Defendants' second dog, Honey, an American Pitbull Terrier puppy.  Plaintiff testified that neither dog had so much as growled at her prior to this incident.

On May 30, 2014, Hailey spent the night at Defendants' home.[3]  On May 31, 2014, Plaintiff called Hailey and told her Plaintiff was coming over to take her home.  When Plaintiff arrived at Defendants' mobile home, she was warmly greeted by Honey who was leashed and sitting on the front of the mobile home's porch.

Since Plaintiff was aware that Daisy often slept towards the back of the porch, Plaintiff called out "Daisy" so she would not be startled when Plaintiff walked around her.[4]  After Plaintiff called her name, Daisy came out from under the steps and Plaintiff attempted to pet her.  When Plaintiff extended her left hand

---

[2] Both Hailey, who is thirteen years-old, and Rebecca, who is twelve years-old, were qualified as competent minors prior to testifying.

[3] Plaintiff testified that she allowed Hailey to spend the night because the families anticipated spending part of Memorial Day weekend together.

[4] The porch was attached to the side of Defendants' mobile home. While Defendants' black-and-white cellphone pictures are blurry, they evidence three wooden steps with space behind the steps that are sealed off from the right by a white, plastic siding with an attached guardrail. *See* Defendants' Exhibit 1.

to pet Daisy, who was also leashed, Daisy bit into Plaintiff's hand, and Plaintiff began screaming for help. She tried to pull away, but Daisy "would not let go," and instead began pulling Plaintiff back toward the porch steps. Plaintiff was fearful that she had lost a finger. Because Defendants and their son were playing horseshoes and Hailey and Rebecca were swinging on a tire rope in Defendants' backyard, no one immediately responded.

When Defendants arrived in their front yard, Daisy released Plaintiff's hand which was bleeding profusely. Defendants' son went to retrieve ice for Plaintiff's hand while Defendant-Jennifer grabbed some paper towels. After wrapping the wound, Defendant-Jennifer drove Plaintiff to a nearby Medical Express in Newark. Plaintiff's hand was cleaned and sutured at the Medical Express on the day of the incident.[5] Plaintiff had a follow-up appointment at Medical Express on June 2, 2014 when the sutures were removed and Plaintiff was informed that she would need surgery; however, after visiting a surgeon, physical therapy was instead prescribed.[6] Plaintiff testified that she attended physical therapy three times a week from June 2014 to January 2015 in order to regain feeling in her hand.[7] After several months of physical therapy, Plaintiff was able to curl her fingers into a fist.

---

[5] Plaintiff provided clear pictures of the suture on the day of the incident. *See* Plaintiff's Exhibit 2.
[6] *See* Defendants' Exhibit 2.
[7] *See* Plaintiff's Exhibit 3.

4

To this day, Plaintiff is unable to extend one of her fingers completely straight and a permanent scar remains.

Because Plaintiff viewed Daisy's attack as an isolated incident, Hailey and Rebecca continued to spend time together, but Plaintiff advised Hailey to be cautious when she stayed at Rebecca's home. While Plaintiff picked Hailey up less frequently from Defendants' home, Plaintiff testified that she trusted Defendants to protect Hailey from a similar incident. Likewise, Plaintiff testified that Daisy had not had any similar outbursts since the incident. Plaintiff and Defendants' cordial relationship continued until Plaintiff began receiving medical bills for her treatment. After receiving several medical bills, Plaintiff called Defendants and asked if they would cover her medical co-payments since insurance paid her remaining medical costs. Defendants refused, challenging Plaintiff to sue them if she wanted them to pay.

## II.    Standard of Review

As trier of fact, the Court is the sole judge of the credibility of each fact witness and any other documents submitted to the Court for consideration.[8] If the Court finds that the evidence presented at trial contains conflicts, it is the Court's duty to reconcile these conflicts—if reasonably possible—in order to find

---

[8] *See Nat'l Grange Mut. Ins. Co. v. Nelson F. Davis, Jr., et. al.,* 2000 WL 33275030, at *4 (Del. Com. Pl. Feb. 9, 2000) (Welch, J.).

5

congruity.[9] If the Court is unable to harmonize the conflicting testimony, then the Court must determine which portions of the testimony deserve more weight in its final judgment.[10] In ruling, the Court may consider the witnesses' demeanor, the fairness and descriptiveness of their testimony, their ability to personally witness or know the facts about which they testify, and any biases or interests they may have concerning the nature of the case.[11]

In civil actions, the burden of proof is by a preponderance of the evidence.[12] "The side on which the greater weight of the evidence is found is the side on which the preponderance of the evidence exists."[13]

### III. Discussion

#### A. Credibility Distinctions

Defendants' testimony was unpersuasive. Defendant-Jennifer and Rebecca testified that Rebecca was not a witness to the incident because she was next door, spending the night at a childhood friend's house. In support of this narrative, Rebecca testified on direct-examination that Hailey and she had never spent time together. Defendants hypothesized, therefore, that Hailey was not at their house on May 31, 2014.

---

[9] See id.
[10] See id.
[11] See State v. Westfall, 2008 WL 2855030, at *3 (Del. Com. Pl. Apr. 22, 2008).
[12] See Gregory v. Frazer, 2010 WL 4262030, at *1 (Del. Com. Pl. Oct. 8, 2010).
[13] See Reynolds v. Reynolds, 237 A.2d 708, 711 (Del. 1967).

6

Defendants' rendition strikes the Court as problematic. First, the First State Animal Center & SPCA Incident Report, which Plaintiff and Defendants both submitted into evidence, states that Plaintiff was bitten when she "was at the owners [Jennifer Rife's] residence to pick up her daughter."[14] Prior to trial, Defendants never disputed this line in the report. At trial, Defendant-Jennifer stated that she had tried to correct the report when the SPCA officer visited her property to check vaccine records; however, she could not provide an explanation as to why the report was not corrected. Second, Defendants provide no alternative explanation for why Plaintiff was visiting their mobile home on May 31, 2014. Defendant-Jennifer simply reiterated that she did not know why Plaintiff was on her property that day.

Defendants' position is particularly difficult to accept when Hailey and Rebecca had been friends for approximately four months prior to this incident, and had spent a significant amount of time together. Moreover, Rebecca contradicted her own testimony when she admitted on cross-examination that Hailey and she had "hung out" on more than five occasions. Plus, Defendant-Jennifer contradicted Rebecca's testimony by noting that Plaintiff previously picked up Hailey from Defendants' home.

---

[14] *See* Plaintiff's Exhibit 1; Defendants' Exhibit 3.

7

Not only did Defendants' cursory questioning of Rebecca fail to offer credible support for their position, but Defendants' testimony also lacked the detail and lucidity of the testimony provided during Plaintiff's case-in-chief. Hailey's testimony was more believable because it was consistent. Plaintiff's testimony was more credible because it was detailed and imputed an air of sincerity. Plaintiff had multiple opportunities to engage in hyperbole and place Defendants in a negative light, yet, she insisted that the bite was a one-time incident. She also testified that Defendants' family aided her and transported her to the hospital after the incident. Further, she did not omit the fact that she stayed at Defendants' home after arriving home from Medical Express, and remained friendly with them until she requested assistance from Defendants in paying her co-payments. When juxtaposed with Defendants' testimony during their case-in-chief, Plaintiff's candid exposition is particularly credible.

## B. Legal Analysis

Enacted in the late 1990s, the "Dog Bite Statute" supplanted the general protections of the premises guest statute and was intended to curb the rising level

8

of dog attacks by "vicious" dogs.[15] The 139th Delaware General Assembly was understandably concerned with protecting "innocent people" from dog attacks.[16]

Delaware law 9 *Del. C.* § 913, which was the applicable version during this incident,[17] states:

> The owner of a dog is liable in damages for any injury, death or loss to person or property that is caused by such dog, unless the injury, death or loss was caused to the body or property of a person who, at the time, was committing or attempting to commit a trespass or other criminal offense on the property of the owner, or was committing or attempting to commit a criminal offense against any person, or was teasing, tormenting or abusing the dog.[18]

As indicated, Delaware imposes strict liability for dog bites. Phrased differently, "Delaware's dog-bite statute imposes liability regardless of whether the owner knew or had reason to know that her dog was inclined toward dangerous behavior."[19] However, common law recognizes assumption of the risk as a valid defense.[20] Also, a defendant may argue that the statute's application contravenes

---

[15] *See Tilghman v. Delaware State Univ.*, 2012 WL 3860825, at *10 (Del. Super. Aug. 15, 2012) (citing *Brady v. White*, 2006 WL 2790914, at *3-4 (Del. Super. Sept. 27, 2006)); *McCormick v. Hoddinott*, 865 A.2d 523, 526 (Del. Super. 2004) (quoting 25 *Del. C.* § 1501).

[16] *See Brady v. White*, 2006 WL 2790914, at *4 (Del. Super. Sept. 27, 2006).

[17] 9 *Del. C.* § 913; *see also December Corp. v. Wild Meadows Home Owners Ass'n*, 2016 WL 3866272, at *2 & n.4 (Del. Super. July 12, 2016) (statute applicable on date of incident). While the wording remains unchanged, 16 *Del C.* § 3053F is the current version as of May 25, 2016.

[18] 9 *Del. C.* § 913.

[19] *Russo v. Zeigler*, 67 A.3d 536, 540 (Del. 2013).

[20] *See id.* at 541-42 (citing *Brady*, 2006 WL 2790914, at *4).

public policy.[21]  If a defendant raises one of these statutory or common law defenses, then the burden to disprove the defense rests on the plaintiff.[22]

Defendants' own testimony clearly satisfies the strict liability language of the statute; Defendants have testified that they are the owners of Daisy and that Daisy bit Plaintiff while Plaintiff was on their property.  Nonetheless, Defendants have raised the statutory defense of criminal trespass under 9 *Del. C.* § 913.  The lowest form of criminal trespass is Criminal Trespass in the Third Degree which is a violation that occurs "when the person knowingly enters or remains unlawfully upon real property."[23]

In the case *sub judice*, there is no evidence that Plaintiff entered or remained unlawfully on Defendants' property.  This Court has held that allowing an alleged trespasser to remain on the property, or failing to request that the alleged trespasser leave the premises, support an inference that the person was lawfully present.[24]  Conversely, evidence that the alleged trespasser was previously banned from the property could support a finding that a trespass occurred. [25]  Even if the Court believed Defendants' version of events, no evidence was presented that Plaintiff

---

[21] *See id.* at 542 (noting the Wisconsin Supreme Court's approach).
[22] *See id.* at 540.
[23] 11 *Del. C.* § 821.
[24] *See State v. Henderson*, 2005 WL 2249086, at *1, 3 (Del. Com. Pl. Sept. 13, 2005) (Welch, J.) (finding no criminal trespass when Regal Cinemas' manager failed to ask defendant to leave and allowed him to stay to watch a second movie).
[25] *See Purnell v. State*, 2016 WL 2982639, at *2 (Del. Super. Apr. 29, 2016) (affirming conviction of trespass in the third degree when trespasser was previously banned from the property).

was told to leave the premises, and Defendant-Jennifer testified that she did not file a criminal complaint against Plaintiff for trespassing. Furthermore, since Plaintiff had walked onto Defendants property countless times prior to the May 31, 2014 incident to pick up Hailey, Plaintiff was certainly not banned from Defendants' property.[26] Thus, 11 *Del. C.* § 821 is inapplicable as Plaintiff was lawfully present to pick up her daughter who had stayed the night at Defendants' home.

Since Defendants' trespass defense does not apply, Defendants are strictly liable for Daisy's actions.[27]

### C. Damages

In Delaware, Defendants are liable for all damages caused by their tortious injury to Plaintiff.[28] Hence, Defendants are liable to Plaintiff for general compensatory damages based on bodily harm and emotional distress that resulted from Defendants' dog biting Plaintiff.[29] Compensatory damages also include medical expenses arising from the tortious conduct plaintiff suffered under "special

---

[26] Notably, the fact that Defendants allowed Plaintiff and Hailey to visit after the incident also discredits Defendants' position that they viewed Plaintiff as trespassing when Daisy bit her.

[27] The Court will not address the remaining four defenses applicable to 9 *Del. C.* § 913—both statutory and at common law—as Defendants did not raise them.

[28] *See F. Giovannozzi & Sons v. Luciani*, 18 A.2d 435, 436 (Del. Super. 1941).

[29] *See Jagger v. Schiavello*, 93 A.3d 656, 667 (Del. Super. 2014) ("General compensatory damages may be awarded without regard to out of pocket losses and are those such that the law presumes to be the natural and probable consequences of the defendants' wrongful conduct."); RESTATEMENT (SECOND) OF TORTS § 905 (1979); *see Re Bangs v. Follin*, 2016 WL 6875959, at *2 (Del. Super. Nov. 21, 2016) ("Both mental and physical pain and suffering may be recovered in a personal injury action where there is physical injury related to the tort, without the need for further expert testimony regarding mental anguish.").

damages," if the medical expenses are shown to be reasonable and proximately caused by the tortfeasor.[30]

Plaintiff failed to provide a sum certain request for damages in her Complaint. In closing, Plaintiff requested that the Court award her $1,560.00 for co-payments she made during her physical therapy treatment, $1,921.87 in medical payments that her insurance company, Highmark Blue-Cross Blue-Shield of Delaware ("Blue-Cross"), made on her behalf, and an unspecified amount for the pain and suffering that Plaintiff experienced as a result of the dog bite.[31]

There is no argument, and no facts suggest, that Plaintiff's damage request for medical expenses is unreasonable and, certainly, no argument that the medical expenses were not directly caused by Defendants' dog. Regardless, Plaintiff failed

---

[30] *See Stayton v. Delaware Health Corp.*, 117 A.3d 521, 522-25 (Del. 2016).

[31] The distinction between co-payments and medical payments covered by Plaintiff's insurance company is rendered immaterial to this Court's damages determination under the collateral source rule. *See Jagger*, 93 A.3d at 659. The collateral source rule holds that Plaintiff is entitled to receive compensation for the amount of money she was billed by healthcare services relating to the dog bite injury. *See Smith v. Mahoney*, 150 A.3d 1200, 1202 (Del. 2016) ("When a plaintiff claims medical expenses as damages in a personal injury suit, we have applied the collateral source rule to gratuitous write-offs by physicians and to payments by private health insurers. In those situations, our prior decisions have allowed the plaintiff to present to the jury the standard cost of the healthcare services instead of the amount actually paid the provider. By operation of the rule in those circumstances, the plaintiff is able to recover amounts that are paid by no one."); *see also Mitchell v. Haldar*, 883 A.2d 32, 39 (Del. 2005) ("[Defendant] contends, however, that the Superior Court correctly ruled [plaintiff] could not recover the full amounts of his medical bills unless those amounts were actually paid by Blue-Cross. [Defendant's] argument reflects a fundamental misunderstanding of the proper application of the collateral source rule to a tortfeasor's responsibility to pay the full reasonable value of the necessary medical treatment caused by the negligent conduct. The collateral source rule provides that 'it is the tortfeasor's responsibility to compensate for the reasonable value of all harm that he [or she] causes [and that responsibility] is not confined to the net loss that the injured party receives.'").

12

to partition the receipts submitted into evidence during her case-in-chief.[32] Plaintiff estimated at trial that she attended physical therapy three times a week from the end of May 2014 to the end of January 2015 and paid a $40 co-payment each visit; however, the resulting estimate is $4,200.00 which far exceeds her demand. Plaintiff also testified at trial that the Consolidated Statement of Benefits provided in Exhibit 3, which lists dates Blue-Cross paid her medical expenses, could be utilized to determine the number of times she made co-payments for physical therapy appointments. Yet, even assuming that every date indicates a physical therapy session, the resulting figure does not reach Plaintiff's proposed amount of $1,560.00. Alternatively, when solely relying on the medical records submitted into evidence—even including duplicate receipts and non-receipts—the Court is unable to determine the basis for Plaintiff's $1,560.00 demand.

Accordingly, based on the medical documentation submitted into evidence, the Court finds that Plaintiff has proven by a preponderance of the evidence that she has suffered $2,821.87 in medical expenses as a result of the bite injury to her left hand. This amount includes: $1,921.87 of expenses Blue-Cross paid on Plaintiff's behalf; $200 in co-payments to Blue Hen physical therapy made in June and July of 2014; $150 in co-payments to Medical Express made on 5/31/2014 and 6/02/2014; $140 billed by Medical Express on 6/18/2014; $370 billed by Delaware

---

[32] *See* Plaintiff's Exhibit 3. Prior to the start of trial, the parties stipulated to the admissibility of all exhibits.

Plastic and Reconstructive Surgery on 6/23/2014; and a $40 co-payment made to Dr. Abdollah Malek of Delaware Plastic and Reconstructive Surgery for treatment on 6/25/2014.[33]

Concerning pain and suffering damages,[34] the Delaware Supreme Court has refused to calculate pain and suffering damages based on a *per diem* calculation that is fixed on a pre-determined daily rate.[35] The Supreme Court views the *per diem* calculation as arbitrary and speculative since each person's experience of pain is unique.[36] As "[t]here is no market price for a scar or for a loss of hearing since the damages are not measured by the amount for which one would be willing to suffer harm," the amount of recovery is discretionary.[37]

Instead of a rigid "mathematical index" that gives an "illusion of precision," the fact-finder should be guided by common sense.[38] In this regard, the inquiry is one of reasonableness.[39] To determine a reasonable amount the Court must

---

[33] *See* Plaintiff's Exhibit 3.

[34] The Delaware Superior Court has stated that awarding medical expenses insinuates pain and suffering occurred. *See Coleman v. White*, 2008 WL 4817074, at *1 (Del. Super. Oct. 24, 2008) (requiring a damage award to be increased when the fact-finder awarded "medical damages" but no damages for pain and suffering).

[35] *See Henne v. Balick*, 146 A.2d 394, 397-98 (Del. 1958).

[36] *See id.* at 398.

[37] RESTATEMENT (SECOND) OF TORTS § 912 cmt. b (1979).

[38] *See* 2 STEIN ON PERSONAL INJURY DAMAGES TREATISE § 8:10 (3d ed. 1997); RESTATEMENT (SECOND) OF TORTS § 912 cmt. b (1979).

[39] *See Turner v. Vineyard*, 80 A.2d 177, 180 (Del. 1951) ("To overthrow an award of damages assessed by the trial judge, the defendants must show that it was so excessive as to be one that the trial court could not reasonably make.").

evaluate the claim under the specific circumstances of the case.[40] The Restatement suggests:

> The length of time during which pain or other harm to the feelings has been or probably will be experienced and the intensity of the distress are factors to be considered in assessing the amount of damages. In determining this, all relevant circumstances are considered, including sex, age, condition in life and any other fact indicating the susceptibility of the injured person to this type of harm.[41]

The Court does not make its determination lightly—evaluating one's pain and suffering is not a simple task. Great thought and consideration underlie the Court's following damage award for the pain and suffering Plaintiff experienced.

After thorough reflection, the Court finds that Plaintiff is entitled to $3,000 in pain and suffering damages. The Court took into consideration the following: (1) Plaintiff's adult age; (2) the bite wound on the underside of Plaintiff's left hand which was a deep, bloody gash that stretched across most of Plaintiff's finger and required stitches; (3) the bite marks on the top of Plaintiff's hand and the resulting swelling; (4) the trauma that occurred when Daisy bit down on Plaintiff's hand as she had never shown any signs of aggression; (5) the fact that Daisy would not release Plaintiff's hand despite Plaintiff's screams; (6) the trauma that resulted from Daisy tugging Plaintiff back toward the porch while she gripped Plaintiff's hand; (7) the lapse of time before Defendants responded and Daisy released

---

[40] *See Dana Cos., LLC v. Crawford*, 35 A.3d 1110, 1113 (Del. 2011).
[41] RESTATEMENT (SECOND) OF TORTS § 905 cmt. i (1979).

15

Plaintiff's hand; (8) the inability for Plaintiff to make a fist or extend the fingers of her left hand immediately after the incident; (9) the need for approximately eight months of physical therapy and further doctor visits to return Plaintiff's left hand to a functional capacity; and (10) Plaintiff's present inability to extend her hand and the scar that remained from Daisy's teeth marks.[42]

As noted above, while the bite itself lasted only a short time, the Court considered the emotional distress during the incident and resulting pain from the bite.[43] Importantly, the Court did not consider any future earning potential or lost wages as the only testimony presented regarding her job was that she currently worked at a "Five Below Distribution Center." Thus, determining such special damages would require speculation.[44]

---

[42] *See* Plaintiff's Exhibit 2 (pictures of Plaintiff's wounds on the day of the incident).

[43] The Court did not consider mental distress beyond the distress that resulted directly from being subjected to the bite, as Plaintiff did not present sufficient evidence on mental or emotional distress that manifested beyond the incident. *See Cadiz v. Perez*, 2017 WL 1162187, at *8 (Del. Com. Pl. Jan. 30, 2017) ("the Court recognizes there is a degree of mental distress inherent within any unprovoked attack in a public place, particularly when the attack causes injury and requires medical attention." (footnote omitted)). This Court has noted, "Delaware recognizes a finding of damages in a personal injury case may include consideration of 'such things as discomfort, anxiety, grief, or other mental or emotional distress.'" *See id.* at *8 n.38 (quoting Del. P.J.I. Civ. § 22.1 (2000)). Furthermore, Plaintiff's continued visits to Defendants' house suggest minimal lasting trauma.

[44] *See Henne*, 146 A.2d at 396 ("The record fails to establish the earning capacity of plaintiff either before or after the accident. . . . As a general rule, [the law] refuses to allow a plaintiff damages relating to the future consequences of a tortious injury unless the proofs establish with reasonable probability the nature and extent of those consequences." (internal citations omitted)); *see also Moody v. Nationwide Mutual Ins. Co.*, 549 A.2d 291, 293 (Del. 1988) (noting that plaintiff had supported his claim of lost wages with a business record and specific testimony regarding the business on direct examination).

## IV.  Conclusion

For the foregoing reasons, the Court hereby enters judgment jointly and severally against Defendants and awards Plaintiff $5,821.87, plus pre- and post-judgment interest at the legal interest rate of 5.75% according to 6 *Del. C.* § 2301, *et seq.*[45]

**IT IS SO ORDERED** this 3rd day of April, 2017.

_____
John K. Welch, Judge

cc:    Ms. Tamu White, Chief Civil Clerk

---

[45] Plaintiff moved for a Directed Verdict at the close of her case-in-chief; however, the Court will not address this motion as this decision renders the motion moot.